EDITH G. GOLDWASSER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 103309. Promulgated August 5, 1942.

*Roswell Magill, Esq.*, and *Clifford H. Domke, Esq.*, for the petitioner.
*Thomas H. Lewis, Jr., Esq.*, for the respondent.

446

OPINION.

MELLOTT: The contract of September 18, 1936, embodied a "plan of reorganization" under the terms of which C. I. T. acquired all the stock of B. E. in exchange for 30,700 shares of its common stock. The plan was carried out and petitioner received common stock of C. I. T. in exchange for her common stock in B. E.

In her income tax return for 1936 petitioner treated the C. I. T. stock as received in a tax-free exchange under section 112 (b) (3) of

the Revenue Act of 1936.[2] Respondent determined that C. I. T. was not a "party to a reorganization." He therefore treated the exchange as a transaction giving rise to gain or loss and the stock received by petitioner as "other property" within the meaning of the statute.[3]

Petitioner contends that there was in fact a reorganization within the meaning of section 112 (g) (1) (B) of the Revenue Act of 1936[4] in pursuance of the plan of reorganization included in the contract of September 18, 1936; that this reorganization was complete within itself and duly carried out according to its terms; that C. I. T. was a party to it; and that the exchange of stock for stock is within section 112 (b) (3), and hence no gain or loss is to be recognized.

Respondent contends that the plan of reorganization embodied in the contract of September 18, 1936, was not, in fact, the whole plan of reorganization; that the entire plan of reorganization included not only the exchange of all the stock of B. E. for common stock of C. I. T., but the transfer of the assets of B. E. to Emmerich for the common stock of Emmerich and the dissolution of B. E. within the year 1936; that this plan was carried out and C. I. T. surrendered for cancellation all the B. E. stock which it had received in exchange for 30,700 shares of its common stock and received, upon the dissolution of B. E. the Emmerich stock which B. E. had received in exchange for its assets; that under these facts C. I. T. was not "a party to a reorganization"; and that the transaction under which petitioner acquired the common stock of C. I. T. was not a tax-free exchange.

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.
* * * * * * *
(b) Exchanges Solely in Kind.—
* * * * * * *
(3) Stock for stock on reorganization.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[3] SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.
* * * * * * *
(b) Amount Realized.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

SEC. 112. RECOGNITION OF GAIN OR LOSS.
* * * * * * *
(c) Gain from Exchanges Not Solely in Kind.—
(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but an amount not in excess of the sum of such mony and the fair market value of such other property.

[4] * * * (1) The term "reorganization" means * * * (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock : of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation ; or of substantially all the properties of another corporation * * *.

Both parties cite and discuss upon brief *Groman* v. *Commissioner*, 302 U. S. 82; *Helvering* v. *Bashford*, 302 U. S. 454; *Anheuser-Busch*, *Inc.* v. *Helvering*, 115 Fed. (2d) 662, affirming 40 B. T. A. 1100; certiorari denied, 312 U. S. 679; and *Gertrude B. Chase*, 44 B. T. A. 39; affirmed *per curiam* June 19, 1942.

The facts and the basic principles of the *Groman* and *Bashford* cases need be examined only briefly. In each there was a transfer of stock or assets by one or more corporations to a subsidiary of another corporation in exchange for stock of the subsidiary, stock of its parent, and cash. It was held that the stock of the parent was "other property" because the parent was not "a party to a reorganization." The Court emphasized that the required continuity of interest was lacking and that the parent corporation in each instance was but a mere instrumentality through which a corporate reorganization was effectuated. These cases and others were discussed by the court and the Board in the *Anheuser-Busch* case, *supra*, and conclusion was reached that, since the sole object and accomplishment of the plan there under consideration required the transfer of the assets and business of a subsidiary of the taxpayer to a subsidiary of the other party, the other party was not "a party to a reorganization" and hence the realized gain must be recognized.

The plan which was before the court and the Board in the *Anheuser-Busch* case was in writing and contemplated that a subsidiary of Borden, the other corporation, would be organized to take over the assets of the taxpayer's subsidiary and the taxpayer was required to co-operate in carrying out this plan. The contract, said the court, "negatived any purpose to retain that continued interest required in a merger." The precise question now before us was not directly in issue. It was suggested in the Board's opinion, however, (l.c. 1107) that if the transfer to the subsidiary had occurred after "a significant interval", the question "might then arise as an issue of fact whether the subsequent transfer was part of the effectuation of the plan of reorganization or independent of it." Subsequently, in *Gertrude B. Chase, supra*, we were called upon to determine substantially the same question as that suggested above, although the situation was "reversed as to the order of the transfers." The transfer had been made to a subsidiary in the first instance; but looking at the whole plan we decided that it "contemplated a merger of the two enterprises rather than the conduct of the acquired business by the vanishing subsidiary, and that it envisaged a continuity of interest in the merged enterprise on the part of those in receipt of its securities." The Circuit Court of Appeals for the Second Circuit affirmed *per curiam* on the authority of the *Groman* and *Bashford* cases.

The cited cases indicate and counsel seem to agree that our question is largely one of fact. If, as petitioner contends, the "plan" was limited to the acquisition of the C. I. T. stock by B. E.'s stockholders and the acquisition of B. E. stock by C. I. T., then petitioner must prevail. But if the plan contemplated the liquidation of B. E., following a temporary holding of the B. E. stock by C. I. T., then respondent's determination must be upheld.

The evidence indicates and we think it must be found that prior to the execution of the agreement of September 18, 1936, it was contemplated that C. I. T., as the sole stockholder of B. E., would cause B. E. to transfer all of its assets, subject to its liabilities, to Emmerich, a subsidiary of its wholly owned subsidiary, Factors, and would then dissolve B. E. This plan is evidenced by several circumstances, among others the "guarantee" letter written by C. I. T. and confirmed by Louis Bachmann, which refers to the agreement of September 18, 1936, as "our proposed agreement with the stockholders of B. E. which we will execute in consideration of your executing this agreement, to be dated September 18, 1936." This letter states: "Subsequent to our acquisition of the stock of B. E. under *The Agreement* * * * We will cause B. E. to transfer in 1936 its assets (excluding dividends described above), subject to its liabilities, to Emmerich, the latter being a subsidiary of Factors, one of our subsidiaries, and to issue stock of Emmerich in exchange for the net assets. We may, if we so desire, dissolve B. E. prior to December 31, 1936." The resolutions of the board of directors of C. I. T., adopted October 22, 1936, at the first meeting of the board following the acquisition of the B. E. stock providing for the immediate liquidation of B. E., support the view that this was an integral part of the whole plan. Finally, the steps which were taken indicate quite clearly a plan existed from the beginning under which they were to be taken. These steps were: first, the exchange of all the stock of B. E. for 30,700 shares of C. I. T.; second, the transfer of the assets of B. E. to Emmerich in exchange for its common stock; third, the surrender for cancellation of all the shares of B. E. by its sole stockholder, C. I. T.; and, fourth, the receipt by C. I. T. of the remaining property of B. E., consisting of common stock of Emmerich.

Petitioner argues that there is no evidence the two letters or the corporate resolutions were any part of the plan of reorganization; that the latter show the transfer of the B. E. assets was made three months after the reorganization of C. I. T. and B. E. and the exchange of petitioner's stock; that both she and her husband testified they understood B. E. was to continue in existence and Goldwasser was to remain its president; that this was petitioner's "main concern" and it is inconceivable she would have consented to a plan of reorganization which embodied the dissolution of her husband's company and

the transfer of its assets; and that the record bears out her contention the whole plan of reorganization was contained in the signed document bearing that label. This argument has been considered, but we do not believe that the ultimate finding requested can be made. No attempt will be made to set out all of the evidence which, it is felt, impels the opposite conclusion. Suffice it to point out that the letters were obviously deemed to be a prerequisite to C. I. T.'s participation in the plan, and that the corporate resolutions liquidating B. E. were promptly adopted and carried out during the taxable year, that Goldwasser carried on all the negotiations leading up to the exchange as petitioner's agent and also represented B. E. as its president, that he, as president and a director of B. E., joined in the adoption of the necessary resolution to liquidate B. E., that in spite of the testimony referred to Goldwasser did not sign the proposed contract of employment but waited until B. E. was liquidated and then entered into a contract with Factors, and that the whole record clearly indicates the plan embraced all of the steps precisely as they were carried out. We hold that the exchange of petitioner's B. E. stock for stock in C. I. T. was not made in pursuance of a plan of reorganization in which C. I. T. was a party and the respondent did not err in holding that the realized gain must be recognized.

The next question is the fair market value of the property received by petitioner. Respondent requests that we find petitioner acquired, on September 30, 1936, a "right" to receive 5,864 shares of C. I. T. stock, that this "right" had a fair market value of $482,314 when received, and that the 5,864 shares, when received on December 31, 1936, had a fair market value of $445,000. The requested findings can not be made. For reasons which will be set out later, conclusion has been reached that petitioner received only 5,163 shares and that she never had any right to receive more. These shares have been found to have had a fair market value of $68 per share on December 31, 1936, or a total value of $351,084. Finding has also been made that the fair market value on September 30, 1936, of the right to receive the shares was not in excess of the fair market value of the shares on December 31, 1936. This finding accords with the testimony of respondent's principal witness. He expressed the opinion that "there was no important difference between the two dates, the vital difference being that the market for the stock declined somewhat during the three months period" and that the right to receive the stock should be evaluated by applying "a discount of about 7½% to the quoted market price of the stock as of September 30, 1936." This resulted in a figure of $445,000, as the value on each date, which is approximately equal to the price at which the stock was selling on the latter date.

In view of the conclusion which has been reached, that the value of the stock and the right to receive it were the same, we deem it unnecessary to decide which date is applicable, since they are both within the taxable period. We pass, then, to a brief discussion of the value found by us.

The evidence of value consists of market quotations and the testimony of two witnesses called by the respondent as experts. The quotations cover the period from August 1936 to the end of the year 1938. Those particularly relied upon by the petitioner—and this is the sole evidence introduced by her on this phase of the controversy— are September 30, 1937, and December 31, 1937. Respondent relies chiefly on those of September 30, 1936, and December 31, 1936. Petitioner's theory is that the provision of the contract of September 18, 1936, prevented her from making a sale of the stock earlier than December 31, 1937—in the alternative September 30, 1937— and that therefore the fair market value of the stock on that date, equivalent to the mean of the high and low quotations, should be used in computing her gain, if any. Respondent contends that the fair market value of the stock on December 31, 1936, or of the right to receive it on September 30, 1936, must be used in computing petitioner's gain— a view which we share—and that this must be determined either upon the market quotations of those dates or upon the testimony of his witnesses. Complete rationalization of the value determined by us of $68 per share can not be made. "In matters so practical as the administration of tax laws and in the decision of problems connected with them, a high degree of precision is often impossible to achieve." Sometimes "an approximation derived from the evaluation of elements not easily measured" must be made. *Helvering* v. *Safe Deposit & Trust Co. of Baltimore*, 316 U. S. 56; cf. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540; *Gloyd* v. *Commissioner*, 63 Fed. (2d) 649; *Fidelity Title & Trust Co.* v. *Commissioner*, 64 Fed. (2d) 52. Some of the evidence upon which the finding has been based may, however, be alluded to briefly.

The quotations during the last five months of 1936 range from a high of 91⅝ to a low of 74½, the average being around 82 or 83. The low is reached near the end of the year. The value requested by the respondent of the right to receive the stock is equivalent to the mean of the high and low on September 30, 1936, or 82¼. His witnesses refused to accept this as the true value and he presents no convincing argument why we should do so. Their estimate of the value of the shares on December 31, 1936, is, of course, a circumstance to be considered by us, though it is not controlling. The record clearly indicates it was bottomed very largely upon the market quotations. Indeed the witness who testified at length (one merely gave his conclusion as to value) stated under cross-examina-

tion that the value fixed by him had been "based on the New York Stock Exchange quotations merely rounding off the New York Stock Exchange to a round sum of money." While the price at which shares of stock are bought and sold on the open market is frequently the best evidence of their value, it is not always the sole criterion to be used.

The evidence indicates that C. I. T. compared very favorably with companies doing a similar business. Its earnings were high, its dividend record good even throughout the depression, and its business had so increased during 1936 that it was able to pay a stock dividend of 20 percent. Those facts, together with the quotations and the testimony of respondent's witnesses, would seem to dictate that a value closely approximating the one requested by the respondent should be found. There are other facts, however, which materially affect the question. One is the provision of the contract requiring that petitioner make no public offering of the stock but hold it "as an investment." In considering the effect of this provision reference must also be made to the fact that most of petitioner's certificates were for 1,000 shares each and were in the form of "less than 100 share certificates", surcharged to show a larger size unit, which, under a ruling of the stock exchange, could not be transferred merely by delivery.

Petitioner contends that the effect of the provision referred to was to restrict her in the sale of the stock. She cites *Helvering* v. *Tex-Penn Oil Co.*, 300 U. S. 481; *Propper* v. *Commissioner*, 89 Fed. (2d) 617, and other cases holding that stock subject to a restrictive agreement preventing its sale has no fair market value. She does not contend that the stock received by her had no fair market value, but only that the fair market value was not in excess of the price at which the stock was quoted on the New York Stock Exchange at the end of the restrictive period, citing *Schuh Trading Co.* v. *Commissioner*, 95 Fed. (2d) 404.

Respondent argues that, since the evidence clearly indicates that the provision was inserted in the contract for the purpose of eliminating the necessity for registration under the Securities Act of 1933, it should be construed in the light of the requirements of that act. This, he insists, justifies a holding that the whole phrase describes a mere present intention of petitioner and does not in anywise circumscribe her future course of conduct. He argues that the provision prohibiting petitioner from making a public offering would not restrict her right to sell it at a private sale, to give it away, to use it to pay her debts, or to put it up as collateral for a loan. He also contends that her right to sell to the public, through brokers or on the stock exchange, depended only "upon the honesty of the intent with which she received it and an honest change in that

intent." He concludes: "The most that can be said is that had she attempted to make a public offer, she might have had some difficulty in persuading others of her honesty; and that thus her freedom of disposition was somewhat narrowed."

Petitioner insists that she would have violated her contract with C. I. T. if she had sold the shares and that C. I. T. was in a position to take effective action either against her or against her husband if she had attempted to do so. In this connection she points out that an attempted sale by her would immediately have come to the knowledge of C. I. T. because of the fact that the certificates were surcharged and, unless she lived up to her agreement, that the relations between her husband and C. I. T. "would have been seriously prejudiced, perhaps even to the extent of a termination of the employment."

While we are of the opinion that the provision did not constitute a restrictive covenant preventing petitioner from disposing of the stock if she had seen fit to do so, we think it did have the effect of depressing the market for her particular shares. This can only be approximated; for it is an "element not easily measured." Considering the fact that the shares could have been disposed of in the manner suggested by the respondent, including a private sale, we have concluded that their actual fair market value was somewhat less than the price at which they could have been sold on the open market on the date actually received. This amount is not greatly in excess of the price at which they could have been disposed of on September 30, 1937, one year after the right to receive them under the contract of September 18, 1936, became vested.

The next question requires determination of the holding period of the 3,436 shares of B. E. stock received by petitioner as a gift from her husband in June of 1936.

Finding has been made that Goldwasser received the certificates for the 3,346 shares "toward the end of the year 1931." The evidence shows he accepted the offer to become an officer of B. E. in July 1931, but did not resign his position with Factors until October 15, 1931, on which date he became president of B. E. Petitioner contends that Goldwasser acquired the shares in July 1931, at the time the offer was accepted. She argues that the stock "constituted compensation constructively received in July, 1931." We do not agree. Goldwasser continued in the employ of Factors until October 15, 1931. His compensation as president of B. E. began at that time. To hold that he was constructively in receipt of compensation prior to that date would be carrying the doctrine of constructive receipt too far. The stock was thought to have, and evidently did have, no value. Goldwasser, testifying as a witness, stated that Bachmann wanted

to give him as much of the common stock as he wished and that he should take whatever he wanted and whenever he wanted it. Apparently he took none until toward the end of the year 1931, the precise date not being shown in the evidence.

Respondent determined that the 3,436 shares had been held for more than two years but for less than five years. Petitioner undertook to show that it had been held for more than five years. In our judgment she has not sustained her burden of proof. Respondent's determination upon this issue therefore must be, and it is, upheld.

The fourth question is whether, in computing petitioner's gain, the value of the 701 shares of C. I. T. stock, which petitioner immediately transferred to Haiblum and Goldblatt, should be included in her gross income. We have found that it should not be.

Respondent's contention is that petitioner either used some of her stock to pay an obligation of herself or of another, or disposed of it by gift. If this were true then the value of such stock must be included in her gross income. *Eisner* v. *Macomber*, 252 U. S. 189; *Helvering* v. *Horst*, 311 U. S. 112; cf. *Schermerhorn Oil Corporation*, 46 B. T. A. 151; *H. Lewis Brown*, 40 B. T. A. 565; affd., 115 Fed. (2d) 337; *Leonard Marx*, 39 B. T. A. 537.

The question is one of fact. The evidence is to the effect that the stock in question was given to Haiblum and Goldblatt for services rendered to Bachmann Co. and B. E. in working out certain details of the reorganization; that they performed no services for petitioner personally; that both she and her husband, who represented her in the negotiations with C. I. T., understood that she was to receive a number of shares less than the number allocated to her B. E. stock and that Haiblum and Goldblatt were to receive the difference as compensation for their services; and that this agreement was carried out.

It is true, as respondent points out, that there is nothing in the record to explain why the 701 shares were not issued directly to Haiblum and Goldblatt. Obviously, however, it was to the interest of C. I. T. that these gentlemen be paid; for it was assuming all of B. E.'s liabilities. Since a substantial portion of the B. E. stock owned by petitioner had been a gift from B. E. to her husband, it is readily understandable that an agreement should have been reached to reduce the shares of C. I. T. which she would receive on the exchange rather than to deduct a part of the 701 shares from the shares to be received by other stockholders. That, in effect, was the testimony. The circumstances pointed out above and the fact that the value of the 701 shares of stock was approximately $47,000 incline us to the opinion that petitioner was not discharging a personal obligation when she transferred the 701 shares to Haiblum and Goldblatt, nor was she paying the obligation of another or making a gift. The

transfer to them was a part of the whole plan, though not specifically set out therein. In other words, petitioner was a mere conduit through which the 701 shares passed to Haiblum and Goldblatt for services rendered to Bachmann Co. and B. E. We have therefore concluded and now hold that the only stock petitioner received over which she could exercise absolute dominion and control was 5,163 shares. Only the fair market value of these shares constituted income to her. Cf. *George G. Moore*, 19 B. T. A. 364; *George W. Mason*, 41 B. T. A. 1287; affd., 125 Fed. (2d) 540.

The last question is whether the December 1936 dividend of $751.25 on the 701 shares of C. I. T. stock turned over to Haiblum and Goldblatt constituted gross income to petitioner. In view of the conclusion reached upon the preceding issue it is unnecessary to discuss this at any length. The dividends belonged to the owners of the shares. Respondent erred in including them in petitioner's gross income.

Upon brief respondent contends that if the value of the 701 shares is not to be included in petitioner's gross income then holding should be made that those shares came out of the ones received by petitioner in exchange for the 3,436 shares. He bases this upon the assumption that petitioner, in effect, had given Haiblum and Goldblatt a portion of her B. E. stock, that they had caused it to be transferred in exchange for C. I. T. stock, and, since no actual designation had been made by her of the shares given up, "her transfer to the attorneys and accountant was out of her first receipts." We have concluded that petitioner became the owner of only 5,163 C. I. T. shares as a result of the exchange of her B. E. shares and that she was a mere conduit through which the 701 shares were delivered in payment of an obligation of B. E. This, we believe, is justified under the evidence. It follows, therefore, that an allocation of petitioner's profit on the exchange should be made in substantially the manner set out in the notice of deficiency.

*Decision will be entered under Rule 50.*