Edwin Singer v. Commissioner.
Singer v. Commissioner
Docket No. 111720.
United States Tax Court
1944 Tax Ct. Memo LEXIS 390; 3 T.C.M. (CCH) 66; T.C.M. (RIA) 44020; January 25, 1944
*390 Joseph J. Klein, Esq., 60 E. 42nd St., New York, N.Y., for the petitioner. F. S. Gettle, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in gift tax liability for the year 1940 in the amount of $10,450.96. The only question for determination is the value of certain shares of Pepsi-Cola stock on October 2, 1940, the date of gift. Petitioner resides at 607 Del Mar Boulevard, Corpus Christi, Texas, and filed his gift tax return with the collector for the first district of Texas. Findings of Fact The Pepsi-Cola Company was organized on August 10, 1931, under the laws of the State of Delaware, with an authorized and issued capital of 300,000 shares of $5 par value each, of which 259,277 shares were outstanding on October 2, 1940. In 1939, after extensive litigation, Loft Incorporated, (hereinafter called Loft) recovered from Charles G. Guth, its former president, and from certain family corporations which Guth controlled, 237,500 shares of stock of the Pepsi-Cola Company. The attorneys representing Loft were paid in 1939, as compensation for their services in this litigation, 13 1/2 percent of the number of *391 Pepsi-Cola shares recovered by Loft in that action. The stock so received by the attorneys amounted to 32,063 shares and was delivered to the attorneys under conditions set forth in an agreement of settlement and compromise dated June 6, 1939, as modified by an order of the Chancery Court of the State of Delaware in and for New Castle County, dated July 7, 1939. The attorneys received 32,063 shares of stock on July 7, 1939. Of the 32,063 shares of Pepsi-Cola stock received by the attorneys as compensation for their services, 15,000 shares could not be sold by them prior to February 1, 1940; 7,000 shares could not be sold until the final disposition of certain litigation known as the Megargel litigation, and the Bartus Trew litigation, and in no event prior to July 1, 1941. The purpose of the Megargel litigation and the Bartus Trew litigation was to recover from Loft some of the stock which Loft had received as a result of its suit against Guth. Of the 32,063 shares of Pepsi-Cola stock received by the attorneys, 10,063 shares were subject to certain purchase options in favor of Loft, as follows: "First Option: One third exercisable during the 60 day period beginning two years after *392 the date of receipt of said stock; "Second Option: One-third exercisable during the 60 day period beginning three years after the date of receipt of said stock; "Third Option: One-third exercisable during the 60 day period beginning four years after the date of receipt of said stock." In the event that the Megargel litigation and the Bartus Trew litigation were not disposed of at the date when the first option became exercisable, "then the first option shall become exercisable during the 60 day period immediately following the date of the final disposition of the said litigations and claims; the second option shall become exercisable during the 60 day period commencing one year after the date of said final disposition; and the third option shall become exercisable during the 60 day period commencing two years after the date of said final disposition." The agreement of June 6, 1939, between Loft and its attorneys contained the following provisions which were not modified by the order of the Chancery Court of July 7, 1939, except with respect to the percentage which was reduced to 13 1/2 percent by said order: "(b) In the event of a final determination in the Megargel litigation *393 reuiring Loft Incorporated to turn over shares of Pepsi-Cola stock to Megargel, you shall be obligated to return 15% [13 1/2%] of the number of shares that Loft Incorporated is so required to turn over, provided, however, that you shall be under no obligation to turn back any of the stock in the event that it is established that you have rights superior to Megargel's rights with reference to the 15% [13 1/2%] of 95,000 shares received hereunder by you. You shall have no obligation to contribute to any settlement of the Megargel litigation which you in your absolute discretion do not consent to. Providing that any settlement involves delivery to Megargel of shares of stock of the Pepsi-Cola Company, and in the event you consent in writing to any such settlement, then you shall be obligated to contribute to the settlement to the extent of 15% [13 1/2%] of the number of shares of Pepsi-Cola stock required to be delivered to Megargel pursuant to the terms of said settlement, which shares shall come out of the 15% [13 1/2%] of the 95,000 share block involved in the Megargel litigation. You shall have no obligation to bear any expense in connection with the defense in said litigation. *394 "(c) In the event of the final determination against Loft Incorporated in connection with Bartus Trew's petition requiring Loft to give up any shares of stock to Pepsi-Cola Company, you shall return your proportionate share out of the 15% [13 1/2%] of 97,500 share block provided, however, that you shall be under no obligation to turn back any of the stock in the event that it is established that you have rights superior to the claims made by Bartus Trew. You shall have no obligation to contribute to any settlement of the Bartus Trew petition which you in your absolute discretion do not consent to. Providing that any settlement of the Bartus Trew petition involves delivery into the Treasury of the Pepsi-Cola Company of Pepsi-Cola stock, and in the event you consent in writing to any such settlement, you shall be obligated to contribute to the settlement to the extent of 15% [13 1/2%] of the number of shares of Pepsi-Cola Company stock required to be delivered pursuant to the terms of such settlement, which shares shall come out of the 15% [13 1/2%] of the said blocks of Pepsi-Cola Company stock aggregating 137,500 shares involved in the Bartus Trew petition. You shall have no obligation *395 to bear any expense in connection with the defense of the Bartus Trew petition." Both the Megargel litigation and the Bartus Trew litigation were settled prior to October 2, 1940, which was the date of the gift in this proceeding. The agreement between Loft and its attorneys further provided that the optioned stock could be sold by the attorneys in the following contingency: "In the event that the market price of Pepsi.Cola stock as evidenced by a sale of said stock on any market shall decline 20% or more within any two-week period, then you shall have the right at any time within six months thereafter to offer in writing all or any part of the stock remaining under option for sale to Loft Incorporated at a price fixed by you, and in the event that Loft Incorporated does not accept in writing said offer within twenty-four hours, you shall be free to sell such stock to any other purchaser, provided, however, that said sale shall not be made at a price less than the price offered to Loft Incorporated until Loft Incorporated is given a further twenty-four hour period within which to accept in writing any lower price submitted in writing by you to Loft Incorporated. In the event that *396 you do not sell all of the stock remaining under option pursuant to the aforesaid right, within the six months' period aforementioned, then the option or options shall remain in force with respect to those shares remaining unsold, such shares to be divided equally between or among the remaining options." The price to be paid by Loft under each option was to be 85 percent of the average market price at which the stock would sell for a period preceding the date of the exercise of each option if the stock were listed on either the New York Stock Exchange or the New York Curb Exchange. If the stock were not listed on either of such Exchanges, the option price was to be 85 percent of 12 times the consolidated net earnings per share of Pepsi-Cola Company, its subsidiaries and affiliates, and any merged or consolidated company. On October 2, 1940, petitioner made a gift of 804 shares of Pepsi-Cola stock; 402 shares to a trust for one sister, and 402 shares to a trust for another sister. These 804 shares were part of the Pepsi-Cola stock which the attorneys representing Loft had received in 1939, as set forth above. These shares were part of a block of 2,355 shares of Pepsi-Cola stock previously *397 received by petitioner as a gift from his brother, Herbert M. Singer, one of the attorneys for Loft in its action againstguth. Petitioner's gifts to his two sisters are set forth in two indentures of trust. Each indenture expressly states that the shares of Pepsi-Cola stock constituting the corpus of the gift are "subject to certain restrictions and options as more particularly set forth in an order dated July 7, 1939, in the action entitled 'Loft Incorporated v. Charles G. Guth, et al.' in the Chancery Court, State of Delaware, New Castle County, consisting of the following: 134 shares subject to the first option, 134 shares subject to the second option, and 134 shares subject to the third option." The gift tax liability disclosed by petitioner's amended gift tax return for the year 1940 amounted to $1,683, which amount was duly paid to the collector of internal revenue on December 12, 1941. One-third of the 804 gift shares, i.e., 268 shares were under the first option to Loft until September 7, 1941; 268 shares were under the second option to Loft until September 7, 1942, and 268 shares were under the third option to Loft until September 7, 1943. Each of the certificates *398 of Pepsi-Cola stock which constituted the gift shares was stamped with a legend that the shares could not be sold until the expiration date of the option. For some years prior to October 2, 1940, the Pepsi-Cola Company was engaged in a great deal of litigation. In March 1936, Coca-Cola Company of Canada, Ltd., brought a suit against Pepsi-Cola Company of Canada, Ltd. (a wholly owned subsidiary of Pepsi-Cola Company) in the Exchequer Court of Canada, seeking to enjoin Pepsi-Cola Company of Canada, Ltd. from using its trade mark "Pepsi-Cola" upon the ground that the trade mark infringed the trade mark "Coca-Cola", and seeking an accounting or damages. After trial, a judgment was rendered on July 15, 1938, holding that the trade mark "Pepsi-Cola" infringed on the trade mark "Coca-Cola"; enjoining the use of the trade mark "Pepsi-Cola" in the sale of that product, and enjoining the use of the trade mark in the corporate name of the Pepsi-Cola Company of Canada, Ltd.; and awarding Coca-Cola Company of Canada, Ltd. either an accounting for profits or damages, whichever it might elect. The Pepsi-Cola Company of Canada, Ltd. took an appeal to the Supreme Court of Canada, and on December 9, *399 1939, the Supreme Court of Canada rendered a decision in favor of the Pepsi-Cola Company of Canada, Ltd., reversing the decision of the lower court. The Coca-Cola Company of Canada, Ltd. then petitioned for leave to appeal to the Privy Council in London, England, and over opposition of the Pepsi-Cola Company of Canada, Ltd., the Privy Council granted leave to appeal. This petition was granted after October 2, 1940, and final decision was rendered in March 1942 in favor of the Pepsi-Cola Company of Canada, Ltd.
In August 1938, shortly after the decision of the Exchequer Court of Canada, Pepsi-Cola Company instituted a suit in the Supreme Court of the State of New York County of Queens, against the Coca-Cola Company, seeking damages and injunctive relief to restrain the Coca-Cola Company from engaging in certain alleged monopolistic and unfair business practices. The answer of the Coca-Cola Company consisted of a general denial and an affirmative defense and counterclaim in which the Coca-Cola Company charged that the trade mark "Pepsi-Cola" infringed its mark "Coca-Cola"; that the Pepsi-Cola Company was guilty of certain acts of unfair competition; and sought an injunction enjoining *400 the Pepsi-Cola Company from using the trade mark "Pepsi-Cola", together with an accounting requiring the Pepsi-Cola Company to account to the Coca-Cola Company for triple the amount of its profits and triple the amount of all damages allegedly sustained by the Coca-Cola Company. As of October 2, 1940, this action was untried, although motions preliminary to trial had been made by both parties to the litigation. The suit was disposed of in May 1942 by settlement, the basis of which does not appear in the record of this proceeding. Prior to October 2, 1940, the Coca-Cola Company brought an action against the Dixie-Cola Company in the United States District Court of Baltimore. In this action, the Coca-Cola Company sought to restrain use of the name "Dixie-Cola" on the ground that it was an infringement on the trade mark of "Coca-Cola". By October 2, 1940, the date of the gift in this proceeding, a decision had been rendered by the United States District Court to the effect that "Dixie-Cola" was an infringement on "Coca-Cola"; the appeal in that case was not decided by the Circuit Court of Appeals for the Fourth Circuit until January 11, 1941, when the lower court was reversed; certiorari *401 was denied on October 13, 1941. This case was of importance to the Pepsi-Cola Company since it was similar to the litigation between the Coca-Cola Company and the Pepsi-Cola Company in which the Pepsi-Cola trade mark was in jeopardy, as well as the profits theretofore earned by the Pepsi-Cola Company. In the appeal before the Circuit Court of Appeals for the Fourth Circuit, the Pepsi-Cola Company was granted leave by the Court to appear as amicus curiae. On October 2, 1940, litigation was pending entitled Joseph H. Loveman and Lewis Loveman, etc. v. Happiness Candy Stores, Inc., Loft Incorporated et al. This was a stockholders' derivative action brought by a stockholder of Happiness Candy Stores, Inc. against Loft and its directors, which sought, inter alia, to impress a trust for the benefit of Happiness upon a portion of the shares of capital stock of Pepsi-Cola Company held by Loft and requiring Loft to account to Happiness for all profits received by it with respect to those shares. The complaint charged that Loft controlled Happiness through acquisition of over 71 per cent of the capital stock of Happiness in August 1930; that Loft, in the litigation of Loft *402 Incorporated v. Guth et al., in the Court of Chancery of the State of Delaware, recovered 91 percent of the outstanding shares of the capital stock of Pepsi-Cola Company, the Court holding that Loft was entitled to recover these shares of stock of the Pepsi-Cola Company because the opportunity presented by the Pepsi-Cola venture was one that belonged to Loft, and that the defendant Guth had violated his fiduciary duty to Loft in acquiring it for himself and because the facilities, assets, personnel and resources of Loft were used by Guth in establishing and furthering the Pepsi-Cola venture; that the opportunity that the Pepsi-Cola venture presented was one which was closely allied to the corporate business of Happiness and Mirror (a subsidiary of Happiness) as well as to Loft, in that the Happiness and Mirror Stores were used by Loft as outlets for the sale of Pepsi-Cola; that factories operated by Mirror in New York and in Baltimore were capable of being used in the manufacture of Pepsi-Cola syrup; that Guth utilized the assets, personnel and resources of Happiness and Mirror in the enterprise; that Loft was indebted to Happiness and was financed by Happiness during the years *403 1931-1935, and by reason of these facts Loft was under a fiduciary duty to press the claim of Happiness for recovery from Guth. The complaint alleged by reason of these facts Happiness was entitled to have a portion of the Pepsi-Cola stock recovered by Loft in the Loft v. Guth litigation impressed with a trust in favor of Happiness, and an accounting for the profits. The Bartus Trew litigation involved a claim for two blocks of Pepsi-Cola stock aggregating 136,500 shares. The litigation was settled in September 1940, and the final order was entered in December 1940. As a result of the settlement of the Bartus Trew litigation, the holders of the gift stock were called upon to contribute their proportionate share of the cash settlement. The Chancellor of the Court in which the Bartus Trew case was tried was advised by an intervenor that a stockholder, one Katherine B. Jones, objected to the settlement and intended to oppose it. This stockholder could either move to intervene and, if intervention was granted, take an appeal within the sixmonth period permitted by the Delaware law, or, in the alternative, start a new litigation. Katherine B. Jones elected to start a new litigation, *404 which was pending at the date of the gift. This action was entitled Katherine B. Jones v. Loft Incorporated and Pepsi-Cola Company and was a representative stockholder's action brought on behalf of all other stockholders of the Pepsi-Cola Company. The complaint sought to compel Loft to account to the Pepsi-Cola Company for two blocks of stock of the Pepsi-Cola Company, (a) 97,500 shares and (b) 40,000 shares of that stock, and to procure a decree directing the surrender of those shares to the Pepsi-Cola Company and also to declare invalid the merger agreement between Loft and Pepsi-Cola Company. At the end of 1930, the Pepsi-Cola Company was in a condition of insolvency; in 1934 the company introduced a 12-ounce nickel bottle of Pepsi-Cola, and the company's growth and progress began at that time; the sale of the drink rapidly increased and the profits of the Pepsi-Cola Company grew. The net earnings per share and the dividends paid per share for the years 1936 to 1940, inclusive, are as follows: Dividends
Net earnings
paid
Year
Net earnings
per share
per share
1936
$1,516,00
$ 5.80
$ 2.00
1937
2,128,000
8.14
none
1938
3,176,000
12.15
none
1939
4,870,000
18.74
15.00
1940
5,826,000
22.45
18.00
*405 In 1939, a new management took charge of Pepsi-Cola Company, and Guth, the former president of Pepsi-Cola Company, and his key associates, were eliminated from the management of the company. Thereupon, Guth and his associates entered into a competing soft-drink business. In 1940, rising war prices of sugar and cola, both of which were imported, had an unfavorable effect on Pepsi-Cola Company in its competition with the Coca-Cola Company since Pepsi-Cola sold a double size drink for a nickel. On October 2, 1940, the stock of the Pepsi-Cola Company was not listed on any Exchange, and there was no material change in stockholders during that month. On November 1, 1940, out of 259,277 issued and outstanding shares of Pepsi-Cola stock, 33 stockholders owned over 200 shares each and an aggregate of 254,955 shares; of these shares Loft owned 205,437 shares; 20 stockholders owned between 100 and 200 shares, aggregating 2,395 shares; 24 stockholders owned from 50 to 100 shares, aggregating 1,391 shares; 293 stockholders owned less than 50 shares each, aggregating a total of 2,745 shares. None of the Pepsi-Cola stock subject to the options in favor of Loft has ever been traded in or sold. *406 The free stock of Pepsi-Cola Company during 1940 was traded over-the-counter and was highly speculative and erratic; the market for the stock was very thin and could not absorb any volume of sales. Approximately 95 percent of all trading in such stock was made by or through Ernst & Company, members of the New York Stock Exchange, and the usual sales were in lots of 5 or 10 shares each. The daily trading in Pepsi-Cola stock in the over-the-counter market by and through Ernst & Company from January 1, 1940 through December 31, 1940, amounted to 806 shares bought, and 841 shares sold, with the high and low prices for each month shown as follows: Shares
Shares
Year 1940
bought
sold
High
Low
January
72
113
263
215
February
25
0
291
290
March
46
39
378
301
April
68
100
360
323
May
87
54
340
230
June
0
0
July
0
0
August
0
0
September
122
70
216
195
October
60
152
215
190
November
0
0
December
326
313
188
165
806
841
The following tabulation shows the purchases and sales by Ernst & Company of Pepsi-Cola stock for the period from May 2, 1940, to May 16, 1940, inclusive: BOUGHT
SOLD
Price
Price
No. of
per
No. of
per
Date
shares
share
Date
shares
share
5/ 2
10
340
5/ 7
1
335
3
1
339
1
335
7
1
330
14
5
300
4
330
15
2
285
10
335
16
8
270
14
1
315
2
255
15
5
270
2
270
16
3
260
3
255
8
260
5
245
2
260
2
260
*407 The daily range of bids and offers for Pepsi-Cola stock for the period from September 25, 1940, to October 8, 1940, inclusive, are as follows: Date
Bid
Offer
Sept. 25, 1940
200
210-215
Sept. 26, 1940
200-205
208-220
Sept. 27, 1940
190-205
208-215
Sept. 28, 1940
200-202
208-212
Sept. 30, 1940
200-202
208-212
Oct. 1, 1940
200-203
210-212
Oct. 2, 1940
200-203
210-212
Oct. 3, 1940
198-202
207-210
Oct. 4, 1940
200-205
206-212
Oct. 5, 1940
208-210
215-218
Oct. 7, 1940
200-212
215-218
Oct. 8, 1940
200-212
213-218
The stock which petitioner gave to his sisters in trust was entitled to receive dividends, did receive such dividends, and had voting rights which the trustees were entitled to exercise. It would have been extremely difficult to sell these shares because of the purchase options, the express restrictions against sale, and the litigation hazards. However the right, title, and interest of the owner thereof could have been disposed of by assignment. The value of 804 shares of unrestricted Pepsi-Cola stock on October 2, 1940, was $144,720, or $180 pershare. The value of 804 shares of restricted Pepsi-Cola stock on October 2, 1940, was $80,400, *408 or $100 per share. Opinion The only question for determination is the value, for the purpose of computing petitioner's gift tax liability for the year 1940, of the gift of 804 shares of restricted Pepsi-Cola stock on October 2, 1940, the date of the gift. In his amended gift tax return, petitioner determined the value of this stock at $100 per share. In respondent's notice of deficiency, he determined a value of $211.50 per share, "based upon the consideration of all relevant factors affecting fair market value, primary weight being accorded bid and offered quotations and the earnings and dividend-paying capacity of the company". This value was several dollars more per share than the sales price or the mean of bid and offered quotations of unrestricted Pepsi-Cola stock on the over-the-counter market on October 2, 1940. Petitioner contends that a block of 804 shares of unrestricted Pepsi-Cola stock had a value on October 2, 1940, of between $150 and $180 per share. He argues that the fair market value of this stock was not determinable on the basis of selling prices or of bid and offered prices since there were only scattered sales of stock in small lots at wide fluctuations in *409 price. He contends that the small sales were not proper indicia of fair market value but were merely speculations on the outcome of litigation pending against the Pepsi-Cola Company. Based upon his value of unrestricted Pepsi-Cola stock, petitioner claims that because of the purchase options and restrictions on the sale of the gift stock, that stock was unmarketable and had no fair market value. For purposes of determining his gift tax liability, however, he now contends that the 804 shares of restricted stock were not worth more than $50 per share on October 2, 1940, and claims a refund on the gift tax paid by him. The statute provides that "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift". Sec. 1005, Internal Revenue Code. The parties agree that the term "value" as used in the statute means "fair market value", and although petitioner could not have sold his stock until the expiration of the purchase options in favor of Loft, that stock had value none the less. The courts have repeatedly approved the ascertainment of fair market value of stock when there was no ready market for it, or where there was a restriction *410 against sale. Kline v. Commissioner, 130 Fed. (2d) 742, 744; Heiner v. Gwinner, 114 Fed. (2d) 723; Newman v. Commisoner, 40 Fed. (2d) 225; certiorari denied, 282 U.S. 858; R. E. Baker 37 B.T.A. 1135; affd., 115 Fed. (2d) 987. Upon due consideration of all of the evidence, including the opinion evidence of the expert witnesses called by petitioner it has been found as a fact that the value of 804 shares of unrestricted Pepsi-Cola stock on October 2, 1940, was $180 per share, and the value of the same number of restricted shares on the same date was $100 per share. The evidence relating to the value of both the restricted and unrestricted stock consists of annual financial reports of the company for the years 1938, 1939, and 1940; dividends and earnings per share of the capital stock of the company for the period 1936 to 1940, inclusive; lists of transactions in the stock on the over-the-counter market throughout the year 1940; a table classifying stockholders by number of shares held; bids and offers *411 on the unrestricted stock for the period from September 21, 1940, to October 23, 1940; the testimony of a director of the Pepsi-Cola Company as to the litigation which was pending against the company, and the testimony of two expert witnesses called by petitioner as to the value of the stock on the date of gift. Respondent called no witnesses and did not offer any evidence. Consideration has been given to all of the evidence. The question relating to the value of the stock constituting the gifts is a question of fact. Heiner v. Crosby, 24 Fed. (2d) 191. Complete rationalization of the value determined by us of $100 per share for the restricted stock cannot be made. "In matters so practical as the administration of tax laws and in the decision of problems connected with them, a high degree of precision is often impossible to achieve." Sometimes, "an approximation derived from the evaluation of elements not easily measured" must be made. Safe Deposit & Trust Co. of Baltimore v. Helvering, 316 U.S. 56. Edith G. Goldwasser, 47 B.T.A. 445. During the taxable year 1940, the Pepsi-Cola Company *412 was engaged in very serious litigation with the Coca-Cola Company in connection with the alleged violation of the "Coca-Cola" trade mark. A Canadian subsidiary of the Coca-Cola Company had commenced an action in 1936 in the Exchequer Court of Canada against a wholly-owned Canadian subsidiary of the Pepsi-Cola Company to enjoin the Pepsi-Cola Company from using its trade mark "Pepsi-Cola", on the ground that the trade mark infringed the "Coca-Cola" trade mark. As part of this litigation, the Coca-Cola Company also demanded an accounting of profits derived by the Pepsi-Cola Company for its alleged unlawful act, or in the alternative, for damages. During the taxable year the litigation was still in progress. In 1938 the Coca-Cola Company made the same allegations in an action in the Supreme Court of New York, County of Queens, and sought an injunction to restrain the Pepsi-Cola Company from using the trade mark "Pepsi-Cola" together with an accounting, requiring the Pepsi-Cola Company to account to the Coca-Cola Company for triple the amount of its profits and triple the amount of all damages allegedly sustained by the Coca-Cola Company. During the taxable year this litigation was still *413 in progress. As a result of these actions, the future status of the Pepsi-Cola Company was in doubt, and the fluctuations in the prices of the stock on the over-the-counter market indicated speculation. There was also a limited amount of Pepsi-Cola stock available for trading in the market. On November 1, 1940, out of 259,277 issued and outstanding shares of Pepsi-Cola stock, Loft owned 205,437 shares. Thirty-three stockholders, including Loft, owned over 200 shares each, and an aggregate of 254,955 shares. Approximately 95 per cent of all trading in the Pepsi-Cola stock was made by or through the firm of Ernst & Company. During the entire month of January 1940, 72 shares were bought and 113 shares were sold; during the entire month of February 1940, 25 shares were bought and no shares were sold; during the entire month of March 1940, 46 shares were bought and 39 shares were sold; during the entire month of April 1940, 68 shares were bought and 100 shares were sold; during the entire month of May 1940, 87 shares were bought and 54 shares were sold; during the months of June, July, and August 1940, there was no trading in the stock at all; during the entire month of September 1940, *414 there were 122 shares bought and 78 shares sold; during the month of October 1940, 60 shares were bought and 152 shares were sold; there was no trading during the month of November 1940; in December 1940, there were 326 shares bought and 313 shares sold. Many of these purchases and sales were matching transactions. The total number of shares bought during 1940 was 804 shares, and the total number of shares sold was 841 shares. The stock reached a high of $378 per share in March 1940, and a low of $165 per share in December 1940. The stock was usually traded in small lots of between 5 and 10 shares each. On October 2, 1940, the date of the gift, 7 shares were sold at $207 per share. During the month of May 1940, on transactions involving 141 shares, the price fluctuated between a high * of $340 on May 2, to a low of $230 on May 21. In view of these circumstances, there can be little doubt that a sale of a block of 804 shares of stock on October 2, 1940, or within a reasonable time thereafter, could not have been made without seriously disrupting the market. One of petitioner's expert witnesses testified that an offer to sell 50 shares of stock would have broken the market 30 to 40 *415 points. We think the evidence fully warrants the conclusion that the sales of the small lots in October 1940 did not signify the fair market value of the Pepsi-Cola stock on that date. The amount of stock sold during this period did not constitute representative sales. As pointed out in Jenkins et al., Executors, v. Smith, 21 Fed. Supp. 251, "in order to be representative the amount of stock sold must bear some reasonable relation in volume to the amount of stock being valued." See, also, Safe Deposit & Trust Co. of Baltimore, Executors, 35 B.T.A. 259; affd., 95 Fed. (2d) 806; Commissioner v. Shattuck, 97 Fed. (2d) 790; Helvering v. Maytag, Executor, 125 Fed. (2d) 55; Helvering v. Kimberly, 97 Fed. (2d) 433. In our opinion, the over-the-counter quotations did not furnish a fair index of the value of the block of stock involved in this proceeding. Both of petitioner's expert witnesses testified that the unrestricted shares of Pepsi-Cola stock had a fair market value on the date of the gift of between *416 $150 and $180 per share, and we have found as a fact that the value of such stock on October 2, 1940, was $180 per share. Factors entering into this determination of value include the quoted market price on October 2, 1940; the volume of sales during the year; the size of the lots sold and the wide fluctuation in price; the prospects, earnings and expenses of the company; and the number of shares involved in this proceeding which could not have been marketed except over a substantial period of time and at a price much less than the quoted price of October 2, 1940. The value of $180 per share seems to be substantiated by the fact that the capital stock of Loft was widely traded on the New York Stock Exchange and on the date of the gift that company owned about 80 per cent of the stock of Pepsi-Cola Company. After giving due effect to adjustments involving other assets of Loft, the price at which Loft stock was selling on the date of the gift was equivalent to a value of $180 per share for a block of unrestricted Pepsi-Cola stock. The stock of Pepsi-Cola, which was the subject matter of the gift, was not unrestricted stock. It was encumbered and restricted by purchase options in favor *417 of Loft; the stock could not be sold to anyone other than Loft for substantial periods of time. The last option in favor of Loft did not expire until September 7, 1943. The trust indentures expressly stated that the shares were subject to the restrictions and options and the certificates of the gift shares were stamped with legends to the same effect. While the litigation between Pepsi-Cola Company and Cola-Cola Company was pending, there was always the possibility that a decision unfavorable to Pepsi-Cola Company would completely destroy the assets of that company and render the stock completely valueless. In this connection, respondent points out that since the stock had decreased in value more than 20 per cent during the two week period of May 1940, petitioner had the right to dispose of the stock to a purchaser other thanloft. On brief, petitioner denies that he had this right. However, the salient fact remains that at the date of the gift, the right had not been exercised and the gift stock was still subject to the purchase options and the restriction against sale. It is apparent that the restriction against the sale of the stock to anyone other than Loft requires a determination *418 that the value of such restricted stock is materially less than the value of unrestricted stock. These restrictions necessarily had a depressing effect upon the value of the stock. A commodity freely saleable is worth more on the market than a precisely similar commodity which cannot be freely sold. Worcester County Trust Co., Executor, v. Commissioner, 134 Fed. (2d) 578. However, the amount by which the restriction depressed the value of the gift stock can only be approximated for it is an "element not easily measured." Petitioner's expert witness, Smith, testified that the value of the stock was not more than $50 per share on the date of the gift. Petitioner's witness, Graham, testified that in his opinion the 804 gift shares were worth between $50 and $72 per share. We cannot fully agree with their opinion because the record indicates that part of such opinion was predicated upon the erroneous belief on their part that the holders of the gift stock would be required to return their proportionate share of the stock in the event of an adverse decision in the Loveman litigation and the Jones litigation. There was some testimony on petitioner's behalf *419 that the attorneys as part of their agreement of compensation with Loft might be required to return their proportionate share of whatever stock Loft might be required to return in connection with these actions. However, the agreement between Loft and the attorneys was incorporated in a letter dated June 6, 1939, which was approved by the Chancery Court of Delaware, as modified by an order dated July 7, 1939. In that written agreement, the attorneys were under no obligation to contribute to any settlement of litigation in the event that they did not consent to such settlement. The only litigation mentioned in the agreement which might require the attorneys to return some of their stock was the Megargel litigation and the Bartus Trew litigation. Those litigations, however, had been settled prior to the date of the gift. There was nothing in the agreement which required the attorneys to contribute to the settlement of the Loveman litigation or the Jones litigation. Under all the circumstances and upon due consideration of all the evidence, it is held that the value of the 804 shares of restricted stock which was the subject matter of the gift in this proceeding was $100 per share on *420 October 2, 1940. Decision of no deficiency will be entered.