JACK I. LeVANT AND MAY LeVANT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3893-63. Filed November 29, 1965.

186

*Julian L. Berman* and *S. Richard Fine*, for the petitioners.
*George G. Young*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year 1960 in the amount of $124,021.02.

The issues for decision arise from a transaction in 1960 by which petitioner, Jack I. LeVant (hereafter referred to as petitioner or LeVant), exchanged an option to purchase a 20-percent interest in the business of S. M. Edison Chemical Co., Inc. (hereafter referred to as Edison, Inc.), for 6,494 shares of stock of Colgate-Palmolive Co. (hereafter referred to as Colgate).

The first issue is whether gain which petitioner realized upon the exchange is to be accorded nonrecognition under the provisions of section 354(a)(1) of the 1954 Code,[1] which provides that no gain shall be recognized upon the exchange of stock or securities of a party to a corporate reorganization for stock or securities of another party to the reorganization.

If it is determined that petitioner's gain is to be recognized, there is the further issue of whether the gain resulting from disposition of the option represents compensation to petitioner, to be taxed as ordinary income, or whether it represents capital gain from the exchange of a capital asset.

If the gain realized by petitioner is determined to constitute compensation, we are to determine whether petitioner is entitled to the benefit of section 1301 providing for the taxation of compensation for an employment which covers more than 36 months if 80 percent or more of the compensation attributable to such employment is received in 1 taxable year.

The final issue for decision is the amount of gain which petitioner realized upon the exchange, which turns upon the fair market value of the shares of Colgate stock which petitioner received upon the exchange.

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife residing in Chicago, Ill. They filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue, Chicago, Ill.

LeVant has been engaged in the sale of drugs and related products since 1932. In 1956 he became interested in buying the S. M. Edison Chemical Co. (hereafter referred to as Edison Co.), a sole proprietorship owned by S. M. Edison (hereafter referred to as Edison), engaged in the manufacure and sale of pharmaceutical products and the production of pharmaceuticals for other companies which marketed the products under their own labels. Edison Co.'s principal product was Dermassage, a nonalcoholic body lotion which it had sold only to hospitals and to other drug concerns. Petitioner had been acquainted with Edison and his products for several years, and beginning in June 1956, he and Edison conferred on numerous occasions about his buying Edison's business. Edison decided that he did not want to sell, but he and petitioner agreed that petitioner was to work for Edison Co. on a trial basis as a consultant for some 3 months, primarily to determine whether Dermassage could be sold profitably on the consumer market. At this time Edison was considering incorporating his business and making an offering of stock to the public, since he realized that the business would require additional funds to market Dermassage in competition with publicly owned pharmaceutical manufacturers. However, Edison took no steps in this regard. Petitioner, during the 3-month period, received a monthly salary of $1,500 and an expense account of $750.

While working as a consultant for Edison, petitioner traveled about the country becoming familiar with Edison's customers and with the potential market which petitioner believed could be established for Edison's products. Petitioner was encouraged and felt that the sales of Edison Co. could be greatly increased. He decided that he definitely wanted to be in the company and that he wanted a share of it if he could not buy the entire proprietorship.

Petitioner discussed with an advertising agency the possibility of engaging in an advertising campaign for the marketing of Dermassage. The advertising executive with whom petitioner discussed this possibility hoped that he might obtain the Edison advertising account and began to make plans for joining another agency, with the idea that he would have the account.

Petitioner prepared a memorandum and a proposal for his continued employment by Edison. He submitted the memorandum and the proposal to Edison on December 26, 1956. In the memorandum he recounted his successful work during the period that he had been a

consultant to Edison, and he referred to his confidence that the Edison business could be increased and that he would be willing to work for a salary and expense account less than he could earn elsewhere if he was given the opportunity to share in the growth of the business. In the written proposal, referred to as "Proposal of Employment," petitioner offered to work as director of sales and merchandising (and to be an officer if the business was incorporated) for a 2-year period. He was to devote his full time, talents, and efforts in the best interests of the company at a monthly salary of $1,500, plus an expense advance of $750, plus a bonus of 2 percent of annual net sales of Edison Co. in excess of $300,000. He was to have an option for a period of 5 years to purchase up to 20 percent of the stock of Edison Co. "at par value as soon as the company is incorporated." Petitioner also proposed that he should not withdraw more than 25 percent of his bonus and that the amount left to his credit should be used to pay for stock purchased under the option, if the company was incorporated in the first year of the employment contract.

Edison did not agree to the proposal, and petitioner, deeming his relationship with Edison Co. terminated, went to the offices of the advertising executive who planned to have the Edison business. This was on December 26–28 of 1956. Petitioner related that he and Edison could not agree on terms for petitioner's permanent connection with Edison. To petitioner, to the advertising executive who wanted the Edison account, and to the executive's associates who had agreed to a partnership based on the Edison business, the fact that petitioner and Edison could not agree on terms for petitioner's permanent connection with Edison meant that there would be no major advertising campaign for Dermassage or for the other Edison products, since it was considered that petitioner rather than Edison would furnish impetus for any sales campaign for Edison products, and that plans for a major advertising campaign which had been contemplated would be abandoned.

While petitioner was in the offices of the advertising agency, Edison came to the offices to confer with him. Petitioner and Edison talked privately, and Edison agreed to give petitioner an option to buy into the business. Edison and petitioner shook hands on the deal. Petitioner told the advertising executive and his associates that he and Edison had come to terms and that there would be an advertising campaign for the Edison products. Petitioner continued to work for Edison without a signed written agreement.

At December 31, 1956, Edison Co. had assets with a book value totaling $262,855.40, including cash in the amount of $36,212.42, accounts receivable in the amount of $77,012.10, inventory in the amount of $73,306.78, machinery and equipment having a book value of $71,744.10,

and an asset termed "Tri Basic Trademark" with a book value of $2,500. The liabilities of the company totaled $8,718.06 and Edison's capital account was in the amount of $254,137.34, including profit for 1956 in the amount of $39,644.03. Sales of Edison Co. for the year 1956 were in the amount of $674,464.17, and gross profit on sales was in the amount of $372,481.64.

Petitioner considered that his principal duty with Edison Co. was to increase and to develop its business to the point where a major company would be interested in acquiring it. He considered that this objective could be best achieved by increasing the sales volume of Edison Co. as rapidly as possible, and at a rate much faster than that which he would seek to achieve if he was attempting to develop the company for a long-range operation.

On April 22, 1957, petitioner and Edison executed a written agreement as follows:

Mr. JACK I. LeVANT
*2935 Sherwin Avenue*
*Chicago 45, Illinois*
DEAR JACK:

Herewith follows the terms of our agreement covering your employment with the S. M. Edison Chemical Company of Chicago:

(1) You are to act as General Manager of the Company in complete charge of sales, merchandising and advertising of all products manufactured by the company for the year commencing January 1, 1957, through December 31, 1957.

(2) You will also lend your assistance and counsel to all matters pertaining to general plant operation and purchasing and generally act in my behalf as requested by me.

(3) In order to assure you the opportunity to make this business profitable, I agree to permit you veto power on expenditures or agreements as concerns advertising promotions, sampling, Executive salaries, other than yours and mine and plant equipment or real estate. In other words you and I will jointly approve or disapprove expenditures.

(4) You and I shall each draw a salary of $18,000.00 per annum. You will continue to have an expense account allowance advance of $750.00 per month with an adjustment at the end of the year covering actual expenses either greater or smaller. I shall have the company reimburse me also for actual business expenses.

(5) In addition to our salaries, we shall divide the net profits before taxes at the end of each year on a 50/50 basis—net profit to be as shown by an audited statement.

(6) As further incentive to employ you, I offer you an option to purchase up to 20% of the S. M. Edison Chemical Company—or its' successors—at a cost to you of $50,000. Payment for same to be made as follows: $20,000 in cash and the balance in equal yearly installments at 3% interest. This option shall be yours for a two (2) year period commencing January 1, 1958.

(7) It is understood that all of the foregoing is conditional to my company showing earnings in 1957 sufficient to pay our combined salaries and expenses for the year 1957. If that develops, I, the company, or its successors, will as part of this agreement offer you a 5-year employment contract on the same terms herein outlined; namely a base salary, expenses, and in addition an equal

(50/50) share of the annual profit as well as all the other provisions contained in this agreement, as concerns management, veto powers, and earnings sufficient to provide our combined base salaries and expenses.

(8) A plan for plowing back the profits earned each year after this trial period that equitable for you, will be submitted between now and year-end, which will apply to your 5 year employment contract.

This covers the basic points of our understanding for your employment. Be assured Jack, that these points shall be incorporated in any contract that may be drawn up between you and I in the future. My signature as sole owner of the S. M. Edison Chemical Company is affixed hereto indicating my acceptance of this agreement. Your signature will be indicative of your acceptance.

Sincerely,

S. M. Edison,
*President*
S. M. Edison Chemical Company

Jack I. LeVant

Jack I. LeVant

Sales of Edison Co. during the calendar year 1957 totaled $994,912.61; operating expenses, including advertising and promotion expenses in the amount of $295,868.02, totaled $613,025.54; and the company realized a net loss of $375.84.

At December 31, 1957, Edison Co. had a net worth, according to its books, in the amount of $231,320.97. Except for cash, receivables, inventory, prepaid expenses, and machinery and equipment, the only asset shown on its books was the asset termed "Tri Basic Trademark" with a book value of $2,500.

In October 1959, Edison, Inc., was incorported under the laws of Illinois with an authorized capital of $100,000, consisting of 1,000 shares of $100 par value common stock. At the time of its incorporation all of its outstanding stock, consisting of 345 shares of common stock, was issued to Edison who transferred to the corporation all of the assets of Edison Co. except accounts receivable.

Prior to October 1959 several large pharmaceutical companies had evidenced an interest in acquiring Edison Co. In late 1959 Edison negotiated with officers and counsel for Colgate regarding acquisition by the latter of all of the outstanding stock of Edison, Inc. Under date of December 15, 1959, Edison and Colgate executed an "Agreement and Plan of Reorganization" providing for the exchange by Edison of 345 shares of the common stock of Edison, Inc. (which Edison warranted represented all the outstanding stock of Edison, Inc.), for 27,344 shares of common stock of Colgate. The closing date was to be January 15, 1960. Attached to the agreement was a balance sheet for Edison, Inc., as of October 31, 1959, showing a net worth for Edison, Inc., in the amount of $108,951.29, and it was agreed that Colgate would be furnished with a current balance sheet for Edison, Inc., as of December 31, 1959. Although the market price of

Colgate stock had been about $37.50 when Edison had been negotiating for the exchange, the parties agreed that, for purposes of the exchange, Colgate stock should be valued at $38.50 per share. In the agreement, Edison represented that his shares of stock of Edison, Inc., were subject to no options or agreements to acquire any shares except for the option held by petitioner which was described in the agreement.

Petitioner and Edison under date of December 15, 1959, agreed that the period for the exercise of petitioner's option to purchase shares of stock of Edison, Inc., was to be extended to February 1, 1960.

Also under date of December 15, 1959, petitioner, Edison, and Edison, Inc., entered into a written agreement which, after reciting that Edison was negotiating with Colgate for the exchange of his 345 shares of stock of Edison, Inc., for 27,344 shares of stock of Colgate, provided that petitioner would simultaneously enter into an agreement with Colgate to transfer and assign to Colgate all of his interest in the agreement of April 22, 1957, with Edison in consideration for 6,494 shares of stock of Colgate. It was also provided that, upon the consummation of the contemplated exchanges by Edison and by petitioner, there would be no obligation on petitioner's part to pay Edison the amount of $50,000 called for in petitioner's option.

Finally, under date of December 15, 1959, petitioner and Colgate entered into an agreement which, after reciting that LeVant claims he holds an option to acquire 20 percent of the business of the corporation (Edison, Inc.) and Colgate is desirous of acquiring LeVant's option in exchange for stock of Colgate, provided that LeVant agreed to assign all his rights under the agreement between LeVant and Edison dated April 22, 1957, in exchange for 6,494 shares of common stock of Colgate. The transaction was to be closed on January 15, 1960. In the agreement LeVant represented that the shares of Colgate stock to be issued to him were to be acquired for investment and not with a view to distribution and with no intention at the time of acquiring of distributing them or selling them for distribution.

Pursuant to the above agreement with Colgate, petitioner executed an assignment dated January 15, 1960, by which he assigned and transferred to Colgate all of his interests under his agreement of April 22, 1957, with Edison. In consideration of this assignment, petitioner received 6,494 shares of common stock of Colgate, which, on January 15, 1960, was selling on the New York Stock Exchange at an average price of $39 1/16 per share.

The representation made by petitioner in his agreement with Colgate that he was acquiring the Colgate shares for investment and not for distribution was required by Colgate because the shares, while admitted for listing on the New York Stock Exchange, had not been registered with the Securities and Exchange Commission for public

sale, as required by the Securities Act of 1933 if they were going to be sold to the public. The investment representation required by Colgate was to protect it from liability under the Securities Act. The shares which petitioner thus acquired were termed "investment letter stock," and although the stock certificates were not stamped in such a manner as to prevent assignment, petitioner was advised by representatives of Colgate that he generally could not sell the shares for a while and that, in any event, he should not attempt to sell any of the shares without first consulting counsel. There was no definite rule under the law or regulations as to how long petitioner would have to hold the shares before selling them on the open market, but it was generally considered by counsel specializing in securities registration matters that an acquirer who had given an investment letter could make a public sale of shares 2 years after acquisition without the SEC considering that the acquirer had originally acquired the shares with a view to sale. Without risking violation of the Securities Act of 1933, petitioner, prior to the expiration of the 2-year period, could have sold Colgate shares at private sale to a buyer who bought with a view solely to investment, who had the same knowledge as petitioner with regard to Colgate, and who gave petitioner an "investment letter." Petitioner did not sell any of the Colgate stock in less than 3 years from the time he acquired it.

After the acquisition by Colgate of all of the stock of Edison, Inc., petitioner became president of Edison, Inc., and a vice president of Colgate.

Petitioner reported as compensation received from Edison Co. and from Edison, Inc., the amount of $4,500 in 1956, the amount of $18,000 in each of the years 1957 and 1958, the amount of $26,692.65 in 1959, and the amount of $24,708.41 in 1960. He did not report any income in 1956 or 1957 by reason of the grant of an option to purchase 20 percent of the business of Edison Co.

Petitioner reported the following total expenses, which were termed "outside salesman expenses," and the following amounts received as reimbursement from his employer:

| Year | "Outside salesman" expenses | Reimbursement |
|------|-----------------------------|---------------|
| 1956 | $9,130.84 | $2,250.00 |
| 1957 | 10,534.80 | 9,000.00 |
| 1958 | 12,524.42 | 9,000.00 |
| 1959 | 11,534.95 | 9,000.00 |
| 1960 | 14,311.48 | 8,158.41 |

In each year petitioner reduced his total compensation received from Edison Co. or Edison, Inc., by the amount by which the foregoing total expenses exceeded the amount of reimbursement in arriving at

the amount of gross income from compensation reported on page 1 of his return.

For the taxable year 1960 petitioner reported as long-term capital gain the amount of $236,878.93 from the sale of a capital asset termed "option to acquire 20% interest in S. M. Edison Chemical Co." at a gross sales price of $251,573.75. Basis was reported as zero, and expenses of sale were reported in the amount of $14,694.82.

In determining the deficiency here involved, respondent determined that in 1960 petitioner realized gain, which constituted ordinary income, in the amount of $236,828.13 from the receipt of 6,494 shares of Colgate stock, computed as follows:

| | |
|---|---:|
| Value of 6,494 shares at $39¼₀ per share | $253,671.88 |
| Less: Expenses | 16,843.75 |
| Gain taxable as ordinary income | 236,828.13 |

In his petition herein petitioner alleged that he received no income on the receipt of 6,494 shares of Colgate in 1960 because it was a tax-free exchange and claimed a refund of $59,094.02 for overpayment of taxes for 1960.

### ULTIMATE FINDINGS OF FACT

Petitioner did not exchange stock of Edison, Inc., for stock of Colgate in 1960 but exchanged an option to acquire a 20-percent interest in the business of Edison Co., or its successor, for 6,494 shares of Colgate stock.

The option to purchase a 20-percent interest in the business of Edison Co. had no readily ascertainable market value at the time it was granted.

Petitioner had only one employment under his employment agreement of April 22, 1957, with Edison.

The fair market value of the 6,494 shares of Colgate stock received by petitioner on January 15, 1960, was $34⅜ per share.

### OPINION

The issues are whether petitioner realized taxable gain in 1960 upon the exchange of an option to purchase a 20-percent interest in the Edison Co. in exchange for stock of Colgate, and if so, the amount thereof, and whether the gain is taxable as ordinary income or capital gain. Neither party suggests that the option here involved was a stock option to which section 421 of the Code would apply, so we are not concerned with employee stock options which have been given special treatment under sections 421–425 of the Code.

### *Applicability of Section 354(a)(1)*

Petitioner contends primarily that the exchange in 1960 was nontaxable under section 354(a)(1) of the Code, which provides that

no gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of a plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. Petitioner claims that he, in substance, exchanged 20 percent of the stock of Edison, Inc., for 6,494 shares of Colgate stock in a reorganization as defined in section 368.

We do not agree that the words "stock or securities" as used in section 354(a)(1) can be interpreted to include the mere right to acquire stock under an unexercised option such as the one here involved. Petitioner's option was to acquire a 20-percent interest in an unincorporated business. But even if this is interpreted to give him an option to acquire 20 percent of the stock of the corporation formed to take over the business, petitioner did not exercise that option and never acquired any stock of Edison, Inc. Instead he assigned all his rights in the contract of April 22, 1957, to Colgate in exchange for Colgate stock. Nor can it be said that petitioner had an equitable interest in 20 percent of the Edison, Inc., stock, which he in effect transferred to Colgate. Petitioner's option was terminable and he had to pay $50,000 to exercise it. It is quite possible that he would never become a stockholder of Edison, Inc., and in fact he never did. His mere right to purchase an interest in the business did not make him a stockholder nor give him such an interest in the stock of Edison, Inc., to qualify his transfer as "stock or securities" in a corporation a party to a reorganization within the meaning of section 354(a)(1). See *Helvering* v. *Southwest Corp.*, 315 U.S. 194.

Petitioner attempts to distinguish the *Southwest* case on the grounds that there the Court held that warrants to purchase stock from the corporation were not voting stock, while here petitioner had an option to purchase stock from Edison personally. Section 1.354-1(e), Income Tax Regs., specifically provides that for purposes of section 354 stock rights and warrants are not included in the term "stock or securities." But we see little difference, with respect to the question being considered, whether what petitioner possessed was a warrant, a stock right, or an option to purchase stock. In either event petitioner had to take some affirmative action to become a stockholder with respect to the stock covered by the warrant, right, or option. Nor do we believe it should make any difference for this purpose whether petitioner had the right to purchase stock from the corporation or from an individual. In either event he would not become a stockholder until he took affirmative action. We do not think this case is distinguishable in principle from the *Southwest* case. However, the differences in what petitioner had to do here to acquire the stock of Edison, Inc., and the rights of the holders of the certificates

of contingent interest involved in *Carlberg* v. *United States*, 281 F. 2d 507, relied upon by petitioner, distinguish this case from that one.

Further, to say that petitioner exchanged stock or securities of Edison, Inc., for Colgate stock would, in our opinion, require rewriting the contract between petitioner and Colgate. The recitations in that contract clearly recognized that Edison owned all the stock of Edison, Inc., and that the most LeVant claimed to have was an option to acquire "20% of the business of the Corporation" in accordance with the agreement between LeVant and Edison dated April 22, 1957, as modified. Therefore LeVant warranted that he was the owner and holder of a valid option to acquire 20 percent of the business of the corporation and thereby agreed to assign to Colgate "all rights of LeVant under said agreement dated April 22, 1957," in exchange for Colgate stock. This clearly negates any claim that in substance LeVant first exercised the option and then exchanged the stock he received thereby for stock of Colgate. The evidence concerning the incorporation of Edison, Inc., LeVant's participation therein, if any, and the negotiations leading up to the transaction with Colgate is far from clear as to just what happened, but there is no evidence that LeVant either notified Edison that he was exercising the option, or ever actually paid Edison $50,000, or ever actually owned any interest in the Edison company or corporation, and the wording of his contract with Colgate indicates that he had only an unexercised option to acquire an interest in the business and that this is what he exchanged for the Colgate stock.

Finally, we see little to be gained by petitioner under this argument in any event, because it would appear that even if petitioner had in substance exercised the option and thus was exchanging stock for stock, we would still be faced with our next question, i.e., whether the option was compensatory in nature and if so, whether petitioner realized ordinary income upon the exercise or sale of the option. If petitioner exercised the option and the option had no ascertainable value when it was granted, petitioner realized ordinary income to the extent that the fair market value of the stock at the time petitioner exercised the option exceeded what petitioner paid for it. *Commissioner* v. *LoBue*, 351 U.S. 243; *Commissioner* v. *Smith*, 324 U.S. 177; sec. 1.421–6(c), Income Tax Regs. Thereafter it would make little difference whether petitioner's transaction with Colgate was nontaxable—he would have little, if any, gain.

### Capital Gains v. Ordinary Income

Petitioner next argues that if the receipt of Colgate stock by petitioner does not qualify as a nontaxable exchange under section 354, then the stock was received in exchange for a capital asset and his gain was a capital gain. Petitioner's position is that the granting of

the option was a taxable transaction in 1957 and that the option was a capital asset which was exchanged for Colgate stock in 1960. The gain realized by petitioner, so he argues, was the difference between the value of the option at the time it was granted and the fair market value of the Colgate shares received in exchange for the option.

As noted above, we agree that what petitioner sold to or exchanged with Colgate in 1960 was the option. And under section 1234(a) of the Code gain or loss attributable to the sale or exchange of an option to buy property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates would have in the hands of the taxpayer if acquired by him. However, section 1234(c) provides that section 1234 shall not apply in certain circumstances, one of which is in the case of gain attributable to an option, any income derived in connection with which, without regard to section 1234, would be treated as other than gain from the sale or exchange of a capital asset. Sec. 1234(c)(2). And section 1.1234–1(e), Income Tax Regs., provides that section 1234 does not apply to gain resulting from the sale or exchange of an option "(1) To the extent that the gain is in the nature of compensation (see sections 61 and 421 * * *)."

There have been numerous court decisions and numerous changes in the law dealing with the taxability of employee stock options; and numerous articles have been written which relate the legislative and judicial history of the subject.[2] We see no point in prolonging this opinion by repeating it here. Suffice it to say that the benefits derived by an employee from stock options (which did not qualify as restricted stock options or other options which qualify under the present sections 421–425 of the Code) which were granted as compensation to the employee were taxable as ordinary income to the employee either when the option was granted or when it was exercised, depending upon whether the option had an ascertainable value at the time it was granted. Unless the option had a market value at the time it was granted which could be said to be the compensation intended, it was held that the gain realized by the employee at the time he exercised the option was the compensation intended and that it was thus taxable as ordinary income at that time. *Commissioner* v. *Smith, supra.*

In *Commissioner* v. *LoBue, supra,* the Supreme Court wiped out the distinction that had previously been recognized by this and other courts, see *Dean Babbitt,* 23 T.C. 850, that if an option to purchase stock could be shown to have been given to the employee to give him a proprietary interest in the business the benefits he derived therefrom were nontaxable, whereas if the option was granted as compensa-

---

[2] See *Rank* v. *United States,* 345 F. 2d 337, and footnotes thereto; 2 Mertens, Law of Federal Income Taxation. sec. 11.11.

tion the benefits to the employee were taxable as such. The Court held that, absent the elements of a gift on the part of the employer, whenever property was transferred by an employer to an employee to secure better services it was plainly compensation taxable as such. While again recognizing that an immediate gain might be realized by the employee on the grant of the option, if the option had "a readily ascertainable market value" and the recipient were free to sell his option, the Court in *LoBue* held that such was not the case where there were contingencies attached to the sale or exercise of the option.

Thus has evolved the doctrine that, unless otherwise provided by statute, if an option granted to an employee has a readily ascertainable value at the time it is granted, the benefit received by the employee at that time may be the compensation intended so that that gain is taxable as ordinary income at that time, and the option would thereafter become an asset in the hands of the optionee of the same character as the property to which it relates. But if the option has no ascertainable value at the time it is granted, the employee realizes no income when the option is granted but the gain he realizes upon the exercise or sale of the option is considered to be compensation to him and taxable as such at that time.

In the light of these pronouncements by the courts, respondent has adopted regulations attempting to provide rules for determining the time gain is realized by an employee granted a stock option, and the character and taxable amount thereof. Section 1.61–15, Income Tax Regs., provides that if a person receives an option, not subject to section 421, in payment of an amount constituting compensation of such person, such option is subject to the rules contained in section 1.421–6 of the regulations for purposes of determining when income is realized in connection with such option and the amount of such income. Section 1.421–6 is said to apply to options granted to an employee, for reasons connected with his employment, to purchase stock of the employer, if section 421 of the Code does not apply. (Section 421 applies only to qualified stock options, employee stock purchase plans, and restricted stock options as defined in sections 422, 423, and 424, and hence is not applicable here.) It is also specifically made applicable to options granted after February 26, 1945, and before September 25, 1959, which are sold or disposed of before exercise.

Section 1.421–6(c)(1), Income Tax Regs., provides that if an option is granted which has a readily ascertainable fair market value (determined in accordance with subparagraphs (2) and (3) of this paragraph) at the time the option is granted, the employee to whom the option is granted realizes compensation at such time equal to the excess of such fair market value over any amount paid for the option; but if the option does not have a readily ascertainable fair market

value at the time the option is granted, the time when the compensation is realized and the amount of such compensation shall be determined under paragraph (d) of the section.

Paragraph (c)(3)(i) provides that when an option is not actively traded on an established market, the fair market value thereof is not readily ascertainable unless that value can be measured with reasonable accuracy, which requires that the taxpayer can show that all of the following conditions exist:

(a) The option is freely transferable by the optionee;

(b) The option is exercisable immediately in full by the optionee;

(c) The option or property subject thereto is not subject to any restriction which has a significant effect on the value of the option; and

(d) The fair market value of the *option privilege* is readily ascertainable in accordance with subdivision (ii) of this subparagraph (which, fortunately, we need not discuss here).

Paragraph (d) of regulations section 1.421–6 provides that if the option does not have a readily ascertainable fair market value at the time it is granted, the employee is considered to realize compensation includable in gross income under section 61 at the time and in the amounts determined therein, which, in case the option is not exercised by the person to whom it is granted but is transferred in an arm's-length transaction, is the time the option is transferred and the amount is the gain resulting from such transfer.

In connection with this argument on this point, petitioner treats the grant of the option to him as a taxable transaction [3] because the option had an ascertainable market value when it was granted but claims that the option thereupon became a capital asset in his hands; and upon the exchange of the option for Colgate stock, petitioner realized long-term capital gain in an amount equal to the excess of the value of the Colgate stock received over petitioner's basis in the option, presumably the fair market value of the option at the time it was granted. Respondent, on the other hand, argues that the option had no readily ascertainable value at the time it was granted so petitioner realized compensation taxable as ordinary income at the time the option was sold, in an amount equal to the excess of the value of the Colgate stock received over petitioner's cost.

To support his position petitioner must initially show that the option had an ascertainable fair market value at the time it was granted. In an effort to do so petitioner offered the testimony of two wit-

---

[3] There can be little doubt that *Commissioner* v. *LoBue,* 351 U.S. 243, as applied to the facts and circumstances of this case, requires the conclusion that the benefits derived by petitioner from the granting of the option were compensation to petitioner. Petitioner testified that his services were worth considerably more than his salary under the contract and that he would not have accepted the employment without the option.

nesses who testified that, based primarily on the sales volume of the Edison business for the year 1956, they would place a value on that business of about $337,000 as of April 22, 1957, and that they would place a value of the option to purchase a 20-percent interest in that business for $50,000 at about $17,000 (20 percent of $337,000=$67,000−$50,000). In arriving at approximately the same value for the option at the time it was granted, both witnesses used a rule of thumb that if the sales volume of a business was under $1 million annually, the business would be valued at one-half the annual sales volume. While the witnesses testified that they took other factors into consideration, neither of them gave any dollar-value weight to any other factors except sales.

While the rule of thumb used by the witnesses may be a convenient method of making a hurried estimate of the value of a going business, we are not at all convinced that anyone dealing at arm's length would arrive at a reasonable purchase price for an option to purchase 20 percent of an unincorporated business sometime in the future by use of this rule of thumb without giving serious consideration to some of the other factors that were present with respect to this option. To mention just a few of them, this business was operated as a sole proprietorship and there was nothing in the employment contract to prevent Edison from stripping the proprietorship of all of its most valuable assets prior to the time LeVant could exercise his option. Edison testified that he thought the business, including goodwill, patents, and other intangibles, was actually worth about $1 million, but that the option price was fixed at 20 percent of the approximate book value of the business ($250,000) as of December 31, 1956. The employment agreement gave both Edison and LeVant sizable salaries and drawing accounts and they were to split the net profits 50–50. The latter provision would in and of itself prevent the net worth of the business from increasing except by agreement of Edison and LeVant to leave money in the business, and would certainly be a limitation on the value of the business to anyone other than LeVant. While there may have been no restriction on LeVant's right to assign the option, he could not assign his personal service contract and his right to receive a salary and 50 percent of the net profits of the business for the performance of those services. And although the option could not be exercised until 1958, the rule of thumb used by the witnesses relied almost entirely on sales volume for 1956, despite the fact that with a considerably higher sales volume the company lost money in 1957 and apparently made little or no profit in 1958.[4] And, as written, the option was

[4] No evidence was introduced reflecting the earnings of the business for 1958, but petitioner did not include in income reported on his individual return for 1958 any amount as his share of the net profits of the business for 1958.

contingent on the business making enough profit to pay the salaries and expenses of Edison and LeVant for 1957.

The evidence presented does not meet the requirements of section 1.421–6 (c) (3) (i), Income Tax Regs., for showing that the option had a readily ascertainable fair market value as of the time it was granted. The option was not exercisable immediately in full by petitioner, and as of the date it was granted, we doubt that the option could have been transferred freely for much value because of the contingency attached to its exercise and the fact that it could not be exercised until 1958.

Furthermore, we do not think any rough or approximate value that might be assigned to the option at the time it was granted was intended to be the compensation petitioner was to be entitled to under the option, if his efforts to market the product Dermassage proved successful enough to make the business attractive to a prospective purchaser. It is rather obvious from both LeVant's proposal to Edison dated December 26, 1956, and Edison's letter to LeVant dated April 22, 1957, which became the employment agreement, that it was contemplated that LeVant would exercise the option and pay $50,000 for a 20-percent interest in the business only if his promotional efforts were successful, and that the year 1957 was to be a trial period. The additional compensation he was to receive under the option would be a share of the fruits of his efforts. Neither Edison nor LeVant testified that he thought the option had any real value at the time it was granted—only the prospects of future value—and neither of them testified that he placed any immediate or present value on the option in his negotiations. This is borne out to some extent by the fact that petitioner apparently made no effort to either assign or exercise the option until the negotiations with Colgate began, at which time the 2-year period for exercising the option had almost expired. Had the option had any value at the time it was granted, i.e., had the option price been less than the market value of the property for which it was given, it would seem that petitioner would have exercised it at the earliest possible date, because he then would have been assured of realizing the present value of the option which he could have either sold at that time or retained to participate in any appreciation in value of the business in the future.

In *Commissioner* v. *Smith, supra,* it was said:

But it is plain that in the circumstances of the present case, the option when given did not operate to transfer any of the shares of stock from the employer to the employee within the meaning of § 22(a) and Art. 22(a)–1. * * * And as the option was not found to have any market value when given, it could not itself operate to compensate respondent. It could do so only as it might be the means of securing the transfer of the shares of stock from the employer to the employee at a price less than their market value * * *. Hence the compensation for respondent's services, which the parties contemplated, plainly was not con-

fined to the mere delivery to respondent of an option of no present value, but included the compensation obtainable by the exercise of the option given for that purpose. * * *

We think the above principle is applicable and controlling under the facts here present. We must therefore conclude that the gain realized by petitioner on his exchange of the option for stock of Colgate was compensation to petitioner for services rendered and taxable as such when received in 1960. See also *Rank* v. *United States*, 345 F. 2d 337; *Robert C. Enos*, 31 T.C. 100; *Dean Babbitt, supra; Charles E. Sorensen*, 22 T.C. 321. We find nothing in the cases cited by petitioner, such as *McNamara* v. *Commissioner*, 210 F. 2d 505, and *Commissioner* v. *Stone's Estate*, 210 F. 2d 33, affirming 19 T.C. 872, which requires a contrary conclusion.

## *Applicability of Section 1301*

Petitioner next contends that if the gain realized by him in the transaction with Colgate was taxable as compensation and ordinary income in 1960, then the receipt of such compensation in 1960 is within the provisions of section 1301 of the Code, as that section applied to the year 1960, and should be spread back ratably over the years 1957, 1958, and 1959.

Section 1301, as applicable to the year 1960, provided that if an individual engages in an employment and the employment covers a period of 36 months or more, and the gross compensation from the employment received in the taxable year of the individual is not less than 80 percent of the total compensation from such employment, then the tax for the year of receipt attributable to such compensation shall be no greater than if the compensation had been received ratably over the months of the employment. The term "an employment" is defined as an arrangement or series of arrangements for the performance of personal services by an individual to effect a particular result, regardless of the number of sources from which the compensation therefrom is obtained.

Petitioner's position is that if the option represented compensation received in 1960, it represented compensation for a particular employment, that of putting Edison Co. in a position where it could be sold to a publicly held company, which was separate and apart from the compensation he received as general manager of the business, and represented all the compensation received for that particular employment. Petitioner acknowledges that section 1301 applies only if the Court finds that there were two employments.[5]

---

[5] Petitioner does not indicate why he makes this concession, but we assume that it is because he believes he does not meet the 80 percent of gross income requirement if all of the compensation he received is considered received from one employment. We accept his concession at face value, and we do not consider the 80 percent of gross income question.

Respondent, in addition to denying that there were two employments for purposes of computing the 80-percent requirement, contends that even if the option was granted as compensation for a separate employment, the option was not granted until April 22, 1957, and therefore that employment did not cover a period of 36 months. We need not deal with respondent's alternate contention because we do not believe petitioner's employment can be divided into two separate employments for purposes of section 1301. The question is one of fact. *Estate of Marion B. Pierce*, 24 T.C. 95.

Both the "Proposal of Employment" submitted to Edison by petitioner under date of December 26, 1956, and the letter agreement prepared by Edison under date of April 22, 1957, and signed by both parties, more details of which are set forth in our findings, refer to petitioner's employment as being the general manager in charge of sales of the company. Neither of them defines his duties any further than that. Both recite that petitioner was to receive a specified salary, expenses, a share in the net profits or net sales, and either an option to purchase a 20-percent interest in the business, or an option to purchase 20 percent of the stock of a corporation that might be formed to take over the business. There is nothing in either agreement to relate any specific part of the emoluments petitioner was to receive to any particular phase of petitioner's duties or efforts on his part. All of the benefits to be paid to petitioner were for his employment as general manager in charge of sales.

The fact that petitioner may have put on a crash sales program to build up the volume of sales faster than normal in order to attract prospective purchasers for the business does not serve to separate his activities into two separable employments. This appears to have been the principal reason for his employment and a logical answer to petitioner's argument is that all of his emoluments under the employment agreement were for carrying out that program.

Petitioner cites *E. A. Terrell*, 14 T.C. 572, *Leon R. Jillson*, 22 T.C. 1101, and *Estate of Marion B. Pierce, supra,* in support of his position. But in each of those cases the taxpayer performed separate and distinct functions and received separate compensation for each. In *Terrell* an officer of the corporation who received a salary was voted a specific sum by the board of directors as additional compensation for past services rendered in connection with certain patent litigation. In *Jillson* the taxpayer received fees for legal services to an estate and also a separate fee as trustee of the estate. And in *Pierce* the taxpayer received a fee as general counsel for a railroad and a separate fee as a court-appointed counsel in reorganization proceedings under the Bankruptcy Act. Instead of supporting petitioner's position here, we think those cases point out the fact that services which are similar in nature and nonseparable, such as those rendered by petitioner here,

cannot be broken up for purposes of section 1301. See *Smart* v. *Commissioner*, 152 F. 2d 333, certiorari denied 327 U.S. 804. We cannot find from the evidence that the option was granted to petitioner for any specific and separate services to be rendered. It appears to have been granted as an added inducement for petitioner to enter the employment of Edison Co. and render better services in the job he was employed to do. Consequently, section 1301 is not applicable to the gain petitioner realized on the transaction with Colgate.

### Value of Colgate Stock Received

Petitioner's final argument is that the value of the Colgate stock he received in the exchange was not the $38½ per share, at which it was valued in the negotiations with Colgate, nor the $39 1/16 per share at which respondent valued it (being the mean between the high and low prices at which the Colgate stock was traded on the New York Stock Exchange on January 15, 1960), but was worth not more than $31½ [6] per share because of the investment representation [7] made by LeVant that he was not acquiring the stock for resale to the public.

In support of this argument petitioner offered the testimony of one witness, an investment analyst with A. G. Becker Co. The witness testified that because it was investment letter stock, which would prevent petitioner from selling the stock on the open market for a period of 1 to 2 years without violating the Securities Act of 1933 unless there was a bona fide change in circumstances, the value of the Colgate stock received by petitioner should be discounted about 20 percent from the price it was currently selling for on the stock exchange. He based this primarily on an analysis of the cost of "puts" for various stocks for various periods of time advertised in the newspapers on January 15, 1960. As we understand the gist of the witness' testimony, it was that petitioner would have had to pay a discount of about 20 percent of the current market value of the stock on January 15, 1960, to be assured that he could sell it at that price at that time in the future when it could be sold on the open market without violating the Securities Act. His alternative, outside of violating the law, would be to sell it privately at that time to someone else who would give an investment representation, and he would have to sell it at about a 20-percent discount from current market price in order to make such a sale. In his opinion the investment letter Colgate stock received by petitioner was worth only $31½ per share on January 15, 1960.

---

[6] There appears to be some confusion in the record as to whether the Colgate stock was worth not more than $31½ or $31¼ per share. Because of the conclusion ultimately reached we need not resolve the conflict presented in the evidence.

[7] This was required in order to make the stock exempt from registration under the Securities Act of 1933.

It has been held in several cases that the restriction on the sale of investment letter stock reduces the value of the stock below the fair market value of the stock without the restriction, see *Edith G. Goldwasser*, 47 B.T.A. 445, affirmed per curiam 142 F. 2d 556; *Victorson* v. *Commissioner*, 326 F. 2d 264, affirming a Memorandum Opinion of this Court; and several recent Memorandum Opinions of this Court; [8] and we have no doubt that it does to some extent. The difficult question is how much it would depress the fair market value.

The only evidence on the subject was the testimony of petitioner's expert witness that in his opinion it would depress the value 20 percent from the stock exchange price. We are inclined to give considerable weight to this uncontradicted evidence, but we must also give consideration to some other factors involved which we think would tend to lessen the discount attributable to the investment representation.

The witness testified that the stock could be sold at any time at a private sale if a purchaser could be found who would give an investment representation himself. The Colgate stock was an average or above average quality stock and it should not have been too difficult to find someone who would be willing to hold the stock for several years. Petitioner appeared to be willing to do this and in fact did not dispose of any of his stock for 3 years after he received it. Petitioner agreed to a negotiated price tag of $38½ per share for the stock for purposes of determining how many shares of stock he was to receive, knowing that the restriction attached to the stock. The value of the stock for petitioner's purposes was apparently not depressed by the restriction. Furthermore, the stock could have been sold on the open market at any time petitioner could convince the Securities and Exchange Commission that the circumstances had changed sufficiently to issue a no-action letter with respect to the stock.

The witness' method of arriving at the discount to be applied also appears to have some weaknesses. The witness could not find "puts" advertised for periods in excess of 190 days. He therefore used the advertised prices for "puts" for 45, 75, and 140 days as the basis for his extrapolation of the prices that would be required for "puts" for a period of a year or more. This extrapolation indicated a 100-percent discount over a period of time, which the witness did not think was logical, so he arbitrarily put a greater curve in the chart line. In addition there were two "puts" advertised for Colgate stock, the one for a short period of time calling for a higher price than the one calling for a longer period of time. This, too, does not seem logical; but it does point up why we think the method used by the

---

[8] *Specialty Paper & Board Co.*, T.C. Memo. 1965–208; *Thomas D. Conroy*, T.C. Memo. 1958–6.

witness in determining the discount that should be applied to the market price for Colgate stock to determine the fair market value of the stock received by petitioner with the restriction attached was not too reliable.

Using our best judgment after considering all of the evidence and circumstances we have found that the fair market value of the 6,494 shares of Colgate stock received by petitioner on January 15, 1960, was $34⅜ per share.

*Decision will be entered under Rule 50.*