ESTATE OF ELIZABETH O'HERRON SULLIVAN, DECEASED, FIRST-CITIZENS BANK & TRUST COMPANY AND JOHN THOMAS SULLIVAN, EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sullivan v. Commissioner
Docket No. 19082-80.
United States Tax Court
T.C. Memo 1983-185; 1983 Tax Ct. Memo LEXIS 599; 45 T.C.M. (CCH) 1199; T.C.M. (RIA) 83185; April 5, 1983. *599 Held, value of restricted stock determined for estate tax purposes. B. Irvin Boyle, for the petitioners. Mathew E. Bates, for the respondent. WHITAKER
MEMORANDUM OPINION WHITAKER, Judge: Respondent determined a deficiency of $2,261,356.75 in the Federal estate tax of the Estate of Elizabeth O'Herron Sullivan. The sole issue for decision is the fair market value of certain stock included in the estate. All the facts have been stipulated and are found accordingly. Elizabeth O'Herron Sullivan (hereinafter decedent) died on December 12, 1976. Petitioners are the executors of her estate. It has been stipulated that when the petition in this case was filed, the individual petitioner resided in Charlotte, North Carolina, and the corporate petitioner was organized *600 under the laws of North Carolina and had its principal office in Smithfield, North Carolina. Petitioners timely filed the Federal estate tax return for the estate of decedent, electing to use December 12, 1976, as the valuation date. Included within the estate were 1,007,340 shares of stock in Eckerd Drugs, Inc. (hereinafter EDI), which decedent owned at the time of her death. Petitioners reported the value of this stock as $7,465,333. In the notice of deficiency, respondent determined that the fair market value of the stock should be increased by $7,493,666. [1]
In the four weeks preceding the December 12, 1976, valuation date, the average weekly trading volume of EDI stock on the New York Stock Exchange (NYSE) was 19,000 shares. December 12, 1976, was *601 a Sunday, a non-trading day. On December 13, 1976, 4,000 EDI shares were traded over the NYSE, with the stock closing at 16-1/2, its high for the day. The following table lists the NYSE monthly volume and closing price for EDI stock during the first 11 months of 1976. [2]
Volume
Closing Price
January
105,900
11.8
February
161,700
14.2
March
82,950
12.8
April
79,350
11.8
May
36,600
11.5
June
40,800
12.3
July
29,400
11.8
August
50,250
11.5
September
210,300
14.5
October
72,550
14.9
November
54,800
16.4
The parties agree that if the per share value of the EDI stock held by decedent were determined solely by its traded price on the NYSE, the value would be $16.46875 per share. The parties also agree, however, that the value of decedent's shares was less than this amount. The dispute centers on what factors adversely affected the value of decedent's stock and how large a discount to apply to the NYSE value. As of December 12, 1976, there were 6,916,965 shares of EDI stock outstanding, 56 percent of which *602 were owned outright or beneficially by the company's three top officers, all of whom were also directors of EDI. Decedent was the wife of one of those officers; therefore, her 1,007,340 shares were part of the 56 percent control block. The 1,007,340 shares that she personally held constituted 14.6 percent of the outstanding EDI shares. The shares held by decedent were unregistered securities, subject to resale restrictions under the Securities Act of 1933, The parties agree that because of the large number of shares involved here, the only viable method by which decedent might have been able to sell these unregistered shares was through a private placement. The purchaser of the shares in such a private placement would continue to be subject to Securities Act restrictions on resale. Therefore, only persons interested in long-term investment would have considered purchasing the EDI stocks held by decedent. Much of the dispute regarding valuation stems from petitioners' view that the value of decedent's stock was seriously affected by contingencies relating to a proposed merger of EDI into Jack Eckerd Corporation (hereinafter JEC). The merger proposal had been announced by JEC *603 in September 1976. Under the terms of the proposal, EDI's shareholders would receive 6/10 of a share of JEC common stock for each share of EDI stock. EDI stockholders were scheduled to vote on the proposed merger at a special meeting set for January 4, 1977. Under EDI's bylaws, the merger could be approved by a simple majority vote. All of EDI's officer-shareholders either supported the merger or did not publicly express an opinion on the merger. After the management of EDI and JEC had formally agreed to the plan of merger, JEC requested a letter ruling from respondent as to the tax exempt status of the reorganization. On December 28, 1976, the Chief of the Reorganization Branch of respondent approved the merger of EDI into JEC as a tax exempt transaction based upon certain representations made in the ruling request. Among the representations that had been made were that EDI shareholders had no plan or intention of selling or otherwise disposing of JEC stock they would receive in the merger if the disposition would cause their holdings to be reduced in value to less than 50 percent of the value of the outstanding stock of EDI as of the date of the merger. By undated letter to *604 JEC, the directors and major shareholders of EDI, including decedent, agreed not to make any sale or disposition of the JEC stock they would receive in the merger if such disposition would result in the loss of the tax exempt status of the merger of EDI into JEC. Sometime before the date of decedent's death, the Federal Trade Commission had begun to investigate the proposed merger to determine whether it violated any Federal antitrust laws. It was not until January 4, 1977, that the Federal Trade Commission announced that it would take no action with respect to the proposed merger. On this date the EDI stockholders approved the merger.The JEC stockholders approved the merger on January 6, 1977, and the merger was closed on January 12, 1977. Both EDI and JEC were engaged primarily in the business of operating drugstores, and both had been experiencing strong growth in both sales volume and profits. EDI had tremendously expanded its operations during the preceding decade. As of November 26, 1976, EDI operated 236 drugstores, located primarily in the Carolinas, Georgia and Alabama. It also operated a chain of 38 apparel shops in the Carolinas and Alabama and office equipment *605 businesses in two North Carolina cities. For each of the fiscal years ended from 1965 through 1976, EDI's net sales, net income, earnings per share and number of stores are set forth below. [3]
Earnings
Number of
Net Sales
Net Income
Per Share
Retail Drug Stores
1965
$29,050,000
$1,351,000
.29
39
1966
33,702,000
1,783,000
.39
43
1967
41,631,000
2,024,000
.44
52
1968
54,772,000
2,487,000
.55
76
1969
73,136,000
2,725,000
.61
93
1970
92,114,000
2,789,000
.61
113
1971
110,146,000
3,567,000
.78
123
1972
127,334,000
5,035,000
1.09
142
1973
149,395,000
5,489,000
1.19
175
1974
176,247,000
5,719,000
1.24
197
1975
198,603,000
6,354,000
1.38
215
1976
233,566,000
8,550,000
1.85
231
*606 JEC's expansion program had been even more successful. From 13 stores in 1961, it had expanded to 521 drugstores as of November 29, 1976. Its heaviest concentration of drugstores was in Florida, Taxes, Louisiana and Georgia. JEC also operated 32 junior department stores in Florida and a few other minor businesses. JEC's net sales, net income and earnings per share for the fiscal years ended from 1965 through 1974 had increased tremendously, as indicated by the comparison below: [4]
Earnings
Net Sales
Net Income
Per Share
1965
$23,055,000
$1,211,000
.10
1966
31,683,000
1,613,000
.12
1967
46,937,000
2,313,000
.18
1968
73,970,000
3,596,000
.26
1969
129,455,000
6,156,000
.45
1970
232,563,000
10,283,000
.63
1971
293,696,000
11,339,000
.65
1972
338,281,000
14,145,000
.77
1973
415,852,000
18,218,000
.98
1974
489,766,000
22,381,000
1.20
1975
555,344,000
24,857,000
1.32
1976
637,241,000
31,254,000
1.65
JEL had 18,909,815 shares of stock outstanding *607 as of July 31, 1976. Its stock rose to a three-year high on the NYSE of $30 per share in January of 1976, trended downward to the $22 level and then recovered to the $26 to $29 level, where it traded from September through December. In the four weeks preceding December 12, 1976, the average weekly trading volume for JEC shares was 70,175 shares. On December 10, 1976, 14,400 JEC shares were traded, with the stock closing at $28-7/8; and on December 13, 1976, 11,400 were traded with the stock closing unchanged at $28-7/8.
Questions of valuation are inherently factual in nature, with the trier of fact having the duty to weigh all relevant evidence of value and draw appropriate inferences. Hamm v. Commissioner,325 F.2d 934 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. The standard for determining fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Section 20.2031-1(b), Income tax Regs. *608 ; United States v. Cartwright,411 U.S. 546, 551 (1973). When valuing unregistered stock subject to restrictions under the Securities Act of 1933, this Court has consistently applied discounts to the publicly traded value in determining the private placement value of such stock. See, e.g., Estate of Piper v. Commissioner,72 T.C. 1062 (1979); Bolles v. Commissioner,69 T.C. 342 (1977); LeVant v. Commissioner,45 T.C. 185 (1965), revd. on other grounds 376 F.2d 434, 441-442 (7th Cir. 1967). Here, petitioner argues for a 55 percent discount, while respondent claims the discount should be only 10 percent. Both parties "have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations--a process clearly more conductive to the proper disposition of disputes such as this." Messing v. Commissioner,48 T.C. 502, 512 (1967). As is too often the situation in valuation disputes, neither party's approach is entirely *609 correct, and the Court itself is required to examine all the factors considered by the experts, as well as the experts' opinions on value. Petitioner submitted valuation reports from three stock brokerage firms. Frank T. Stempel of Merrill, Lynch, Pierce Fenner & Smith, Inc., expressed the opinion that the discount should be at least 50 percent; Michael Saperstein of Baer, Sterns & Co. believed that the discount should be at least 55 percent; and William S. Green of Dean Witter Reynolds, Inc., estimated that a discount of at least 40 to 50 percent should be applied. All three reports are extremely brief and give no information concerning the qualifications of the individuals making and appraisals. [5] None of them explain the valuation method used or the weight given to particular factors. Almost all the facts set forth in the reports relate to either the reasons the stock would have to be sold through private placement, the proposed merger of EDI into JEC, or the recent trading history of EDI and JEC stocks. None of these reports attempts to analyze what factors relating to the economic health of either EDI or JEC, other than the pending merger, would have been considered by *610 a prospective purchaser of decedent's stock. In Rev. Rul. 77-287, 1977-2 C.B. 319, respondent recognizes that all facts and circumstances that bear on the value of restricted securities should be considered in arriving at their fair market value. The ruling identifies certain factors that normally have a substantial impact on the fair market value of restricted securities. Among the listed factors are the corporation's earnings, net assets and net sales. We agree that these are important factors which should be considered here. Because of the resale restriction, a person would not have purchased decedent's shares for speculation. The purchaser would have been an investor, committed to hold the shares for an extended time. The amount of discount that would have been demanded by such a purchaser would have turned on the purchaser's perception of the degree of risk *611 he would have incurred by tying up his investment for such a long period. See Campbell v. United States,661 F.2d 209, 222,     Ct. Cl.     (1981). To assess the degree of risk, the purchaser would have been particularly concerned about anticipated earnings and sales growth. Campbell v. United States,supra.[6] These are factors never mentioned in the reports submitted by petitioners. This failure, when combined with the brevity of the reports and the inadequate explanations of the appraisers' qualifications, leads us to conclude that these reports should be given little, if any, weight. Furthermore, as explained below, the reports of petitioners' appraisers incorrectly assumed that the value of decedent's shares would have been depressed due to certain factors relating to the proposed merger. Petitioners advance several overlapping arguments concerning how circumstances surrounding the proposed merger depressed the value of the stock held by decedent. When reduced to their essentials, these arguments appear to be as follows: (1) After the September 1976 *612 announcement of the proposed merger, EDI stock traded on the NYSE at a premium of from $3 to $5 per share over its "normal" price. (2) A purchaser of decedent's stock might refuse to agree to the proposed merger, or the purchaser might dispose of JEC stock received in the merger and thereby threaten the merger's tax-free status. (3) A potential purchaser of decedent's stock would have recognized these threats to the merger and would have required an extra discount because any factor reducing the probability of the merger being successful would have depressed the value of EDI stock back toward its "normal" pre-September 1976 value. The inherent contradiction of these arguments is obvious. The arguments are premised upon the assumption that a purchaser of decedent's stock might act differently than decedent or the other major stockholders of EDI would have acted with respect to the proposed merger. However, petitioners have blinded themselves to the fact that any prospective purchaser would not have had to worry about a third party acquiring decedent's stock and blocking the merger.If the prospective purchaser's bid were accepted, he--not an adverse third party--would be the owner *613 of decedent's stock. Therefore, in negotiating to purchase decedent's stock, he would have had no reason whatsoever to fear that the sale of the stock by decedent would endanger the success of the merger. Petitioners' argument that a purchaser might dispose of JEC stock received in the merger and thereby treaten the tax-free status of the merger fails for precisely the same reason. The important facts relating to the proposed merger, most notably the pending Federal Trade Commission investigation, were public knowledge. We must assume that purchasers on the NYSE took all these facts into consideration.Apparently, the believed not only that the proposed merger would significantly benefit EDI shareholders but also that the prospects for the merger being consummated were quite high. The market's optimism toward the merger was reflected in the "premium" for which the stock traded after the merger announcement in September 1976. Absent unusual circumstances, which are not present here, the market itself is the best judge of value. See Campbell v. United States,supra at 221; Frizzelle Farms, Inc. v. Commissioner,61 T.C. 737 (1974), affd. *614 511 F.2d 1009 (4th Cir. 1975). We believe the premium at which EDI stock traded in the fall of 1976 accurately reflected the increased value of publicly traded stock at that time. Of all the factors mentioned by petitioners, we believe the only ones that would have actually affected the value of the stock held by decedent were the restrictions against public sale, the large size of the block of stock and to a lesser extent the agreement by the EDI shareholders to refrain from violation of the conditions of the tax ruling. We turn now to an analysis of the valuation report prepared by respondent's expert, Harris Berenholz of Arnold Bernhard & Co., Inc. Respondent has provided detailed information establishing the professional expertise of Mr. Berenholz. His report is far more thorough than any of those submitted by petitioners, and it does not suffer from the flaw of assuming that decedent's sale of her stock would have threatened the merger or its tax-free nature. Furthermore, the report correctly proceeded from the viewpoint that the private placement discount must be determined by analyzing the risks and restrictions that an investor would incur in purchasing the *615 stock. Mr. Berenholz's report recognized that the restricted nature of the shares held by decedent would have necessitated selling them only in a private placement, with the purchaser subject to resale restrictions under the rules of the Securities and Exchange Commission. He pointed out, though, that private sales of substantial blocks of unregistered securities were not an unusual occurrence. Based on statistics in the Institutional Investor Study, Report of the Securities and Exchange Commission, H.R. Doc. No. 92-64, 92d Cong., 1st Sess. (1971), he stated that the typical private placement discount for stocks traded on the NYSE was between 10 and 20 percent, although many factors would affect the particular valuation. Because he saw both EDI and JEC as strong and growing companies in rapidly expanding markets and because he believed the merged corporation would be even stronger, he concluded that a discount of only 10 percent was appropriate. The report contains a detailed analysis of the economic health of both EDI and JEC. Statistics in the report demonstrate that the profit margins for both EDI and JEC had been consistently higher than those for the entire drugstore industry *616 for at least the prior five years. In the preceding five years, EDI's earnings per share had grown on the average at an annual rate of 17.5 percent; those of JEC had grown at a 22 percent compounded annual rate. Other positive factors were that both companies operated largely in areas in the Sun Belt where there had been significant growth, both companies were in excellent financial shape, with adequate working capital and relatively small amounts of debt, and prospects for economic growth during 1977 were favorable for the U.S. economy and the drugstore industry. Mr. Berenholz recognized that the probability of the merger being successfully completed had to be considered, since the failure of the merger plan would be likely to cause EDI's stock to drop 3 or 4 points per share, back to the level at which it traded before the merger proposal was announced. If the merger prospects had been highly speculative, EDI stock would have been less attractive to a purchaser constrained to hold it for long-term investment. In view of the attitudes of JEC's management and EDI's officers and principal stockholders, Mr. Berenholz found there was as of the valuation date a high probability that *617 the merger would be completed. Because there was little overlap in the geographic territories serviced by the two corporations, he believed the Federal Trade Commission would take no action to block the merger. He also pointed out that stocks that are the subject of merger or takeover bids generally trade at a discount from the value of the offering price, typically in the 10 to 20 percent range. However, the EDI stock was trading at a discount of only 4.6 percent, which indicated that purchasers on the NYSE were convinced the merger would be consummated. Mr. Berenholz was correct in focusing on the economic health of the underlying corporations and the prospects for the merger being completed. Certainly, a prospective purchaser of decedent's stock would have wanted detailed information concerning the stability of an investment in EDI and JEC, given the resale restrictions. We believe, however, that Mr. Berenholz did not give sufficient weight to the fact that we are dealing here with a block of stock representing almost 15 percent of the outstanding stock of EDI. A purchaser of such stock would have been required to pay over $16-1/2 million if the equivalent amount had been *618 purchased on the NYSE. The size of the block of stock, as well as the restricted nature of the stock, would have significantly limited the number of available purchasers. Although Mr. Berenholz mentioned the size of the block of stock as a factor affecting valuation and certainly also considered the restricted nature of the stock, we do not believe that the 10 percent discount gave sufficient weight to the size of the block. It also appears that Mr. Berenholz failed to take into consideration the effect of the agreement of the EDI shareholders to protect the tax-free nature of the transaction by a collective restriction upon resale. In effect, there were two separate resale restrictions, that caused by the Securities Act and that resulting from the conditions of the tax ruling. Mr. Berenholz did not mention the latter and may not even have been aware of it. At least the record is silent on this point. Upon our analysis of all the facts in the record, we find that a 15 percent discount is appropriate. Accordingly, the December 12, 1976, value of the 1,007,340 shares held by decedent was $14,101,186. Decision will be entered under Rule 155.
Footnotes
1. The statutory notice stated that the correct fair market value of the EDI stock was $14,858,999. However, this figure is $100,000 less than the sum of the amount reported by petitioner ($7,465,333) and the amount by which respondent increased the value of the stock ($7,493,000)--$14,958,999. The use of the lower figure appears to have been simply a typographical error, which petitioners recognized in paragraph 4(k) of their petition.↩
2. Adjustments were made to the October and November entries to account for a three-for-two stock split in October 1976.↩
3. In this comparison, net sales and net income are rounded to the nearest thousand; earnings per share are adjusted for 100 percent stock dividends distributed in January 1968 and November 1971; no adjustment has been made for the fact that 1971 and 1976 were 53-week fiscal years; and the net income and earnings per share figures for 1971 exclude amounts attributable to an extraordinary sale of property in that year.↩
4. Net sales and net income are rounded to the nearest thousand, and earnings per share is adjusted for several two-for-one stock splits during this period.↩
5. The fact that the appraisals are on firm letterhead and that one of the individuals was a vice president and another a general partner does not substitute for a description of the individual qualifications.↩
6. See Stroupe v. Commissioner,T.C. Memo. 1978-55↩.