Hugh N. Mills and Jane W. Mills v. Commissioner.
Mills v. Commissioner
Docket No. 3960-65.
United States Tax Court
T.C. Memo 1967-67; 1967 Tax Ct. Memo LEXIS 192; 26 T.C.M. (CCH) 349; T.C.M. (RIA) 67067; April 5, 1967
*192 1. Amounts of accounting fees determined. 2. Amount of unreported income represented by unexplained bank deposits determined. 3. Amount of deductible travel expenses determined. 4. Held, cashier's check received by petitioner was a loan rather than income to petitioner. 5. Gain realized on exercise and/or sale of stock options was compensatory and taxable as ordinary income - amount thereof determined. Arthur T. Ciccarello, L. & S. Bldg., 810 Quarrier St., Charleston, W. Va., for the petitioners. Rodney G. Haworth, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in *193 petitioners' income tax for taxable year 1961 in the amount of $9,716.78. Jane W. Mills is a party-petitioner solely because she joined in the joint income tax return made and filed for Hugh N. Mills, who will hereafter be referred to as petitioner. The issues for decision are: (1) Whether petitioner realized unreported income in 1961 in the amount of $100, representing an accounting fee. (2) Whether petitioner realized unreported income in 1961 evidenced by "unexplained" bank deposits, in the amount of $1,550. [1]
(3) Whether petitioner is entitled to a deduction for travel expenses in 1961 in the amount of $200. (4) Whether petitioner realized unreported income in 1961 in the amount of $2,000, evidenced by a cashier's check. (5) Whether the profit on petitioner's *194 sale or exercise in 1961 of stock options, and from the sale of stock, which profit was reported in the amount of $10,450 and allegedly unreported in the amount of $14,200, constituted ordinary income or capital gain. For clarity certain background facts relevant to all issues will be set forth first, and will be followed with the findings of fact and opinion relating to each issue in order. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife, residing in Charleston, W. Va. They filed a joint Federal income tax return for the taxable year 1961, on the cash method of accounting, with the district director of internal revenue, Parkersburg, W. Va.
Petitioner was a certified public accountant. In 1957 he organized and obtained a corporate charter from the State of West Virginia for Mountaineer Fire & Casualty Insurance Co. (hereinafter referred to as Mountaineer). However, petitioner was unable to raise sufficient capital for the corporation to meet the minimum requirements of West Virginia law to be licensed to do business as an insurance company and Mountaineer was not so licensed until about July of 1961. *195 It was inactive until the latter date. Petitioner became insurance commissioner of West Virginia in January of 1961 and served in that capacity until April or May of that year, at which time he became business manager of the State Road Commission of West Virginia. He continued to serve in the latter capacity throughout the remainder of 1961. Petitioner also continued his accounting practice to a limited extent during 1961. On his Federal income tax return for 1961 petitioner reported income in the following amounts from the following sources: Employer
Wages
State Road Commission
$ 7,431.82
Mountaineer Fire & Casualty Ins. Co.
1,400.00
State Insurance Commissioner
3,024.19
Total
$11,856.01
He also reported that he had received $430 as "Accounting Fees" and $67.77 as "Insurance Agent Commissions." On an attached Schedule D, Gains and Losses From Sales or Exchanges of Property, he reported "Sale of options - Mountaineer Fire and Casualty Ins. Co." acquired February 23, 1959, sold for a price of $10,450. He reported that the options had no cost or other basis to him and the gain of $10,450 was reported as long-term capital gain. Also on the return for 1961 *196 petitioner itemized deductions from adjusted gross income, and he claimed a deduction in the amount of $200 as travel expenses. Issue 1. Accounting Fees Findings of Fact In his accounting practice during 1961 and prior thereto petitioner had an arrangement with Robert Hart (hereafter referred to as Hart), a public accountant, under which petitioner referred accounting work to Hart. Petitioner billed his clients for the entire fee for work done and paid Hart a portion of the fee, depending on the amount of work Hart had done. Petitioner submitted invoices in 1961 to clients for accounting work, and Hart's share of those fees were, as follows: Hart's Share
Client
Fee
of Fee
River Lake Estate, Inc. $100 $100
River Lake Estate, Inc.
450
225
Little Indian Sewer System,
Inc.
50
25
The First National Bank of
Ripley
100
50
Vale Funeral Home
150
25
Wm. M. Morgan
10
5 $860 $430
Respondent does not dispute that petitioner shared fees with Hart and has not determined that Hart's share of fees, as shown above, are taxable to petitioner, except that respondent has determined that the entire fee of $100 billed to River Lake Estate, *197 Inc., and received by petitioner in 1961 was taxable income to petitioner in 1961. Opinion It is clear from the record that Hart performed his work for River Lake Estate, Inc., relating to this fee in 1960 and that petitioner paid Hart $100 for this work in 1960. However, petitioner did not bill River Lake Estate, Inc., for this work until 1961 and reecived the $100 fee from River Lake in that year. Inasmuch as petitioner computed taxable income by the cash method, it would appear that petitioner would have been entitled to, and may have claimed, a deduction in 1960 for the amount paid to Hart, but the income is taxable to petitioner in 1961. Petitioner argues that the $100 paid Hart was merely an "advance" against the bill which was sent to the client in 1961. The evidence does not support this argument. On this issue we hold for respondent. Issue 2. Unexplained Bank Deposits Findings of Fact During 1961 petitioners made the following bank deposits in their accounts which respondent determined constitute unreported income: Bank of West Virginia
Date of
Amount of
Form of
Deposit
Deposit
Deposit
Feb. 2, 1961
$ 80.00
currency
Feb. 6, 1961
91.30 [1]
check
Feb. 16, 1961
410.00
currency
Mar. 4, 1961
91.30 [1]
check
Apr. 3, 1961
340.00
currency
Apr. 15, 1961
100.00
currency
May 12, 1961
100.00
currency
July 27, 1961
400.00 [1]
check
The First National Bank of Ripley
Jan. 14, 1961
$249.55 [1]
currency and
May 13, 1961
250.00 [1]
checks
The Kanawha Valley Bank - Insurance Account
July 18, 1961
$500.00
currency
Total: $2,612.15
*198 During 1961 petitioner borrowed various sums of money from James V. Brown (hereafter referred to as Brown), an attorney practicing in Washington, D.C., and in Charleston, W. Va.; he also loaned money to Brown in that year. Also, from time to time during 1961 Dale Keith Cook (hereafter referred to as Cook), a friend and associate of petitioner, loaned sums of $20, $30, $40, $50, and $60 to petitioner. On one occasion in about May 1961 Cook loaned $100 to petitioner by depositing the sum in one of petitioner's bank accounts. Cook mailed the deposit, but it is not clear whether the deposit was by check or currency, although Cook did not ordinarily send currency through *199 the mail. Opinion In an endeavor to carry their burden of proof, which is clearly upon them, petitioners have attempted to show that the foregoing "unexplained" bank deposits do not constitute income but are derived from amounts loaned to petitioner during 1961. There is testimony from Brown that he loaned petitioner $3,000-$4,000 in 1961; Cook has testified that he loaned petitioner relatively minor sums from time to time. Petitioner also testified that he loaned Brown money during 1961. But, with one exception, none of these witnesses was able to relate any of the deposits in question to any specific loan. As will appear from the discussion of other issues in this opinion, Brown apparently loaned petitioner money in 1961 for specific purposes which would not have found its way into petitioner's bank account. Of course it is possible that some of these deposits did represent money that was not taxable income - but we cannot find that petitioners have carried their burden of proving that respondent's determination was in error by simply showing a possible nontaxable source for the currency deposited, particularly when the evidence relied upon is as indefinite as it is here. Petitioner *200 apparently kept rather accurate records of his income from salaries and his accounting practice. If the questioned deposits represented currency loaned to him by Brown and Cook, which they testified he repaid, it is rather strange that petitioner had no record, either in his checkbook or elsewhere, to identify the source of these currency deposits. The one exception referred to above is the $100 which Cook testified he deposited in one of petitioner's bank accounts in May of 1961 to cover a check petitioner had written while he was in Florida. Cook's testimony was not very specific as to which bank the deposit went to or whether it was by check or in currency. However, there was a deposit of $100 in currency in petitioner's account in the First National Bank of Ripley on May 12, 1961, and a deposit of $100 by check in the Bank of West Virginia on May 13, 1961, which are not explained. We will accept the testimony of Cook and petitioner as sufficient evidence to carry petitioners' burden of proof with respect to $100 of the deposits still in dispute. But we must hold against petitioners with respect to the remaining $1,450 of unexplained deposits for failure to carry their burden *201 of proof. Issue 3. Travel Expense Findings of Fact In 1961 petitioner, as a CPA, maintained an office in Charleston, W. Va., for at least part of the year. His clients and prospective clients in 1961 were located in towns other than Charleston - River Lake Estate, Inc. (on Coal River about 20 miles away); Ripley, W. Va. (43 or 44 miles away); Parkersburg, W. Va. (79 miles away); and Huntington, W. Va. (about 50 miles away). Petitioner visited these clients and prospective clients on trips made in his automobile. In preparation of his return for 1961 petitioner estimated the number of miles he had traveled on accounting business and estimated the cost, including depreciation, oil and gas, etc., of operating his automobile for that many miles. Petitioner estimated that he had traveled about 3,000 miles during the year on accounting business and that this should entitle him to a deduction of $300, but he claimed a deduction of $200 so that, according to petitioner, there would be no question raised about the deduction. Opinion The facts from which this issue can be resolved are meager. [2] On the one hand it is clear that petitioner used his automobile in visiting clients and *202 prospective clients. It is not clear why petitioner was not reimbursed by his clients for travel expenses, if such was a fact. It also appears that petitioner's claimed deduction is inordinately high when compared to the accounting fees earned in 1961 in the gross amount of $530. We have no way of knowing the rate of depreciation for petitioner's automobiles or even their cost and we have only a rough estimate of the miles driven on accounting business, but bearing heavily on petitioner because the inexactitude is of his own doing, we must make the best estimate that we can under the circumstances. We must keep in mind that petitioner did not devote the full year 1961 to his accounting business. We hold that petitioner is entitled to a deduction for travel expenses in the amount of $100 for 1961. See Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930).
Issue 4. $2,000 Cashier's Check Findings of Fact In May or June 1959 petitioner and James Stuckey (hereafter referred to as Stuckey) acquired some land in Charleston, W. Va., in their joint names. *203 In September 1959 petitioner and Stuckey "parted company." Litigation between petitioner and Stuckey ensued. This litigation ended in a settlement between the parties whereby petitioner would obtain title to all the property except for two lots and petitioner was to pay Stuckey $4,000 in two $2,000 installments, the first installment being due upon the entry of the court's order terminating the litigation. Petitioner was also to assume a mortgage on the property. When the time came for petitioner to pay the first installment of the amount of the settlement he did not have $2,000. He asked Brown for a loan of the amount, but Brown did not have the funds either. However, Brown told him that he might be able to borrow the $2,000 from Alex Dandy (hereafter referred to as Dandy) with whom Brown was acquainted. Brown asked Dandy to loan the $2,000 to petitioner. Dandy agreed but required that petitioner give him a check for $2,000 which Dandy would hold until repayment. Petitioner obliged. Either Dandy or Brown obtained a cashier's check in the amount of $2,000, payable to petitioner and drawn on the Kanawha Banking & Trust Co., Charleston, W. Va. Petitioner endorsed the check payable *204 to his lawyer in the litigation for delivery to counsel for Stuckey. The check was also endorsed by petitioner's counsel and was endorsed for deposit to the account of Stuckey's counsel. Respondent determined that petitioner realized unreported income in 1961 in the amount of $2,000 evidenced by the cashier's check. Opinion While the fact that this cashier's check was dated June 5, 1961, 2 days after the stock transaction discussed in issue 5 below took place, casts some doubt on petitioner's explanation of this item, we do have the undisputed testimony of petitioner and Brown that this $2,000 cashier's check represented a loan from Dandy to petitioner for the specific purpose of meeting petitioner's obligation to Stuckey under the settlement agreement. We also have in evidence the check which, through the endorsements appearing thereon, indicates that it ended up in the hands of Stuckey's counsel in the litigation. We also have in evidence a $1,000 check of petitioner's dated August 14, 1961, payable to Dandy, and a $1,000 check of Brown's dated September 9, 1961, payable to Dandy, which checks both petitioner and Brown testified were issued to repay the loan to Dandy. Both *205 witnesses testified that Brown paid Dandy for petitioner because Dandy insisted that the loan be paid off in full at a time when petitioner did not have the funds to pay the $1,000 balance due. Dandy was not available as a witness, but he appears to have endorsed both checks. On balance, we accept the explanation of petitioner and Brown with respect to this item, and hold for petitioner on this issue. Issue 5. Exercise and/or Sale of Stock Options and/or Stock Findings of Fact Petitioner organized Mountaineer as a casualty insurance company in West Virginia in 1957 and obtained a certificate of incorporation for it. Initially, he was a stockholder of the corporation; [3] petitioner Jane W. Mills owned 50 shares; and 50 shares stood in the name of John T. Atkins who acted as an incorporator as an accommodation to petitioner. Although Mountaineer had a certificate of incorporation it could not obtain a license from the office of the State insurance commissioner to engage in the casualty and fire insurance business until it had capital and surplus in the amount of $150,000, and this amount had to be raised before January 1, 1958, when State insurance regulations became stricter, *206 requiring capital and surplus funds in an amount greater than $150,000. Petitioner attempted to raise the necessary capital and surplus to permit Mountaineer to obtain the requisite license. He registered the stock of the corporation with the securities commissioner of West Virginia and obtained subscriptions for 30,000 shares of stock at $1.50 per share. Petitioner, who was president of the corporation, found that he could not raise any more capital and returned to the subscribers the amounts of their subscriptions. During the period when he was attempting to sell stock subscriptions, he had an agreement with Mountaineer that he could purchase 25,000 shares of stock of the corporation at $1.50 per share. Petitioner did not exercise this right and gave up the attempt to obtain the necessary subscriptions. In early 1959 petitioner was approached by two men engaged in the insurance business, Given and Knighton, who were confident that they could obtain subscriptions for the stock of Mountaineer to raise the necessary capital and surplus for it to engage *207 in the fire and casualty insurance business. In return for their promotional effort to sell stock, they asked for some interest in the corporation. In anticipation of sales of stock, petitioner secured an amendment to the certificate of incorporation of Mountaineer to increase authorized capital to $260,000. [4]
The minutes of a meeting of the board of directors of Mountaineer held on January 28, 1959, attended by petitioner, Jane Mills, and Atkins, reflect that the directors discussed the subject of compensating petitioner for his services rendered and to be rendered to the company, at which time petitioner agreed to surrender his option to buy 25,000 shares of the stock of the company at $1.50 per share in exchange for an option to buy 60,000 shares of the company at $1 per share. Thereupon a resloution was adopted granting petitioner such an option upon the terms indicated below. The directors also adopted a resolution authorizing the officers "to offer for sale, to sell, and issue" 199,890 shares of stock of the corporation at a price of $2.50 per share. Pursuant to the resolution *208 of the board of directors, Mountaineer entered into a written agreement with Mills whereby petitioner, "in consideration * * * of the benefits that the Company has and will realize from the efforts, services and abilities of Mills in founding and organizing this Company * * * and also in consideration of the present employment, and probable continuing employment, of Mills as President of this Company," was granted an option, exercisable in any series of transactions over a 10-year period, to purchase up to 60,000 shares of stock of the corporation at $1 per share. Except for the options, petitioner received no other compensation from the corporation for his efforts in organizing Mountaineer or in promoting sales of its stock. Under date of February 27, 1959, petitioner entered into an agreement with Knighton and Given under which they agreed to sell stock of Mountaineer and to continue selling said stock until 200,000 shares were sold. In return petitioner agreed "to assign" to Knighton and Given the option for each of them to buy 10,000 shares at $1 per share when 100,000 shares had been sold and another 10,000 shares when 200,000 shares had been sold. It was provided that Knighton *209 and Given would forfeit their rights under the agreement if they failed to secure subscriptions for a period of 60 days. This agreement was nullified when Knighton and Given failed to meet the forfeiture provisions. While some of the stock of the corporation was apparently sold during 1959 and 1960, it did not produce a sufficient amount of capital for Mountaineer to meet the State requirements for obtaining a license to engage in the insurance business. The corporation was inactive during this period. In January 1961 petitioner attempted to divest himself of all interest in, or connection with, Mountaineer, because he had been appointed insurance commissioner of West Virginia. He discussed this matter with W. D. Jefferson (hereafter referred to as Jefferson), Brown, and Curtis Trent (hereafter referred to as Trent). Jefferson and Trent showed interest in taking over control of the corporation. Petitioner told them that he had spent about $10,000 in forming the corporation and in promoting the sale of its stock. Jefferson and Trent decided to obtain control of the corporation, and petitioner received a check from Trent on January 21, 1961, in the amount of $6,000 and a check from *210 the corporation on January 23, 1961, in the amount of $2,750. [5] The total amount of $8,750 was considered by petitioner to be in consideration for the sale of what interests he had in the corporation, including "40,000 options at least." On January 17, 1961, petitioner sold 100 shares of stock, for which he paid $1 per share by exercising his option, to Hart for $2.50 per share. On January 19, 1961, petitioner sold 200 shares of the stock, for which he paid $1 per share, to Chambers for $2.50 per share. Petitioner exercised his options to acquire this stock simultaneously with the sales thereof. On January 21, 1961, petitioner either sold options to Cartwright for $1,000, or transferred options to Cartwright in payment of a debt of $1,000. On July 31, 1961, petitioner sold 250 shares of stock, for which he had paid $1 per share, to Whittington for $2.00 per share. [6]
*211 On their income tax return for 1961, petitioners reported all of the above transactions, including the transactions with Jefferson and Trent, as long-term capital gains from the sale of options of Mountaineer. The total sales price reported was $10,450 with no deduction for cost. [7]
In May 1961, after he left the insurance commissioner's office, petitioner was asked to come back and assume management of the corporation. He agreed to do so at the request of Jefferson and Brown, provided they would take the responsibility of raising sufficient capital to qualify the corporation for obtaining a State insurance license. On June 3, 1961, petitioner, who at the time had no formal connection with Mountaineer, traveled to Huntington, W. Va., for a meeting with Jefferson, Dandy, Brown, and Glen Sowards (hereafter referred to as Sowards) who was, presumably, secretary or secretary-treasurer of the corporation. Jefferson was then president. As a result *212 of or during this meeting various certificates representing shares of stock of the corporation were issued. Jefferson and Sowards signed the certificates. Certificate No. 104 was the first certificate issued that day. Certicate No. 101 representing 12,000 shares was turned in to the corporation, and certificate No. 104, representing 8,000 shares, was issued to Patsy Graziano, and certificate No. 105, representing the remaining 4,000 shares represented by No. 101, was issued in the name of petitioner. Also, certificates Nos. 106, 107, 108, and 109, representing, respectively, 4,000, 4,000, 12,000, and 6,400 shares of stock of the corporation, were issued in the name of petitioner who, immediately upon receiving the certificates issued in his name, endorsed them all in blank and delivered them to Dandy. Petitioner did not then become the owner of the stock represented by these certificates but the certificates were issued in petitioner's name so it would appear that he controlled the corporation. For a reason not appearing in the record, Dandy did not, on June 3, 1961, pay for the stock represented by the certificates which he beneficially received. Instead, petitioner gave Sowards *213 his check for $34,000, payable to the account of Mountaineer, and he asked Sowards not to cash it at that time since he did not have funds to cover it. By mistake, the check was deposited by Sowards to the account of Mountaineer in a bank in Charleston, W. Va., on June 6, 1961, and was subsequently returned for insufficient funds. On June 7 Dandy gave petitioner a cashier's check for $31,000. Petitioner deposited this check and $3,000 in currency [8] in his insurance account on June 8 to cover the $34,000 check he had given Sowards. The latter check was then honored and Mountaineer's account was credited with the $34,000. On or about July 15, 1961, petitioner purchased 1,000 shares of stock from Mountaineer for $2.50 per share, giving his check for $2,500 to Mountaineer for the purchase price. This check was deposited to its bank account by Mountaineer on July 15 but was charged back against the account when petitioner's check was returned for insufficient funds. Petitioner later made this purchase good by paying Mountaineer $2,500 by three checks dated August 4 for $500, September 12 for $250, and September 22 *214 for 1,750, all of which were deposited in Mountaineer's account. On July 31, 1961, petitioner sold Binstock 200 of the above shares for $2.50 per share; on September 15, 1961, he sold 100 of the above shares to Williams for $2.50 per share; and on September 22, 1961, petitioner sold Dandy 700 of the above shares for $2.50 per share. Petitioner did not realize any gain on the sale of these shares. On September 15, 1961, petitioner sold 100 shares of Mountaineer, for which he had paid $1.50 per share, to Williams for $2.50 per share. Petitioner realized a gain of $100 on this transaction. [9] Petitioners did not report any of these sales on their income tax return for 1961. On or about September 8, 1961, pursuant to some prior agreement, petitioner gave Dandy a check for $8,000 and received in exchange stock certificates No. 105 and No. 107, each representing 4,000 shares of stock of Mountaineer. This check was drawn on the account of Brown at the Buffalo Bank but represented funds of petitioner. In his notice of deficiency respondent determined that petitioner *215 realized a profit of $24,650 from the sale of options and stock, $10,450 of which petitioner had reported as long-term capital gain and $14,200 of which was unreported profit. Respondent determined that the entire $24,650 was additional income taxable as ordinary income, and reduced petitioners' reported income by the $5,225 long-term capital gain included in petitioners' income on their return. Respondent's determination on this issue is explained as follows. [10] It includes the $6,000 received from Trent, the $2,750 received in behalf of Jefferson, and the $1,000 received from Cartwright, from the sale of options. It also included the $150 gain on the sale of 100 shares to Hart, the $250 gain on the sale of 250 shares to Whittington, and the $300 gain on the sale of 200 shares to Chambers. The total of the above gains, $10,450, was the gain reported by petitioner. In addition, respondent's computation includes $300 gain on the sale of 200 shares to Binstock, $100 on the sale of 100 shares to Williams (which petitioner concedes), $150 on the sale of an additional 100 shares to Williams, $1,050 gain from the sale of 700 shares to Dandy, and $12,600 gain on the sale of 18,400 shares *216 to Dandy on June 3, 1961. Respondent's computation reflected that petitioner had a cost of $1 per share in all of the above stock except the 100 shares sold to Williams, in which it reflected that petitioner had a cost of $1.50 per share. Of the 18,400 shares sold to Dandy on June 3, respondent's computation indicated that 10,000 of the shares were sold to Dandy for $1 per share, and the remaining 8,400 shares were sold for $2.50 per share. The total unreported gain was said to be $14,200. Opinion The facts with respect to this issue are confused in the record and it is impossible to determine even how many shares of stock and how many options petitioner owned at any given time. [11] *217 We have done the best we could to determine just what took place in the various transactions which occurred in 1961 involving the stock of the corporation and the stock options granted to petitioner. Our findings of fact above reflect the factual conclusions we have drawn from the evidence presented. *218 Petitioner reported on his 1961 return that he had sold stock options for a total selling price of $10,450. While it appears from the evidence that a part of the amount reported by petitioner represented gain on the sale of options or on the sale of stock immediately after it was acquired by exercise of options, the parties are in agreement on the total gain realized on the various transactions involved, which we have outlined in our findings of fact. In view of our ultimate conclusions on this issue it would make no difference whether the gain was realized from the sale or exercise of options or from the sale of stock. If it was gain from the sale or exercise of options it is taxable as ordinary income for reasons hereinafter set forth; if it was gain on the sale of stock it is taxable as shortterm capital gain. Respondent contends that any gain realized by petitioner on the exercise or sale of the stock options, which had no ascertainable value at the time they were granted to petitioner, was compensation to petitioner and taxable as ordinary income to him when sold or exercised. Petitioner does not argue that the options had an ascertainable value at the time he received them, *219 but does contend that the stock options were not granted to him as compensation. He contends that they were given to him in order that he might enter into agreements with Knighton and Given which would permit them to buy stock of Mountaineer at $1 per share if they were successful in selling shares to the public at $2.50 per share. Therefore, petitioner argues, the options were capital assets in his hands and any gain he realized on the sale thereof was taxable as long-term capital gain. Petitioner's contention is contrary to the weight of the evidence. It is clearly stated in the minutes of the directors meeting, wherein the options were authorized, that they were to be issued to petitioner as compensation for past and future services. The agreement of February 23, 1959, granting the options to petitioner recited that the consideration was benefits that the company had realized and would realize from petitioner's efforts, services, and abilities. Furthermore, petitioner testified that he had received no other compensation from Mountaineer for his services. We are satisfied that the options were granted to petitioner as compensation to him and for reasons connected with his employment *220 as an officer of Mountaineer, see Commissioner v. Lo Bue, 351 U.S. 243, and that the options had no ascertainable value when they were granted. Therefore, the legal status of the options and the effect of the exercise or sale of them is governed by section 1.421-6, Income Tax Regs.[12]
*221 We have had occasion to discuss the provisions of the above regulation and to apply them to a concrete set of facts in Jack I. LeVant, 45 T.C. 185 (1965), on appeal (C.A. 7, May 18, 1966). We said in the LeVant case: unless otherwise provided by the statute, if an option granted to an employee has a readily ascertainable value at the time it is granted, the benefit received by the employee at that time may be the compensation intended so that that gain is taxable as ordinary income at that time, and the option would thereafter become an asset in the hands of the optionee of the same character as the property to which it relates. But if the option has no ascertainable value at the time it is granted, the employee realizes no income when the option is granted but the gain he realizes upon the exercise or sale of the option is considered to be compensation to him and taxable as such at that time. Under the above rules any gain realized by petitioner on the exercise or sale of the options was taxable as ordinary income. This leads to the conclusion that the gain of $10,450 reported by petitioner on the transactions giving rise to this gain is taxable as ordinary income *222 as contended by respondent rather than long-term capital gain as contended by petitioner. Respondent also contends that petitioner realized a gain on the two sales of stock to Williams, on the sale of 200 shares of stock to Binstock, and on the sale of 700 shares of stock to Dandy. Except for the 100 shares of stock sold to Williams on September 15, on which petitioner concedes he realized a gain of $100, we have found that petitioner sold this stock for the same price he paid for it and consequently petitioner realized no gain on the transactions, except as conceded. This brings us to the final transaction which occurred on June 3, 1961. Respondent contends that in that transaction petitioner sold 18,400 shares of stock to Dandy for a total selling price of $31,000 (10,000 shares at $1 per share and 8,400 shares at $2.50 per share) in all of which petitioner had a cost basis of $18,400 ( $1 per share); therefore petitioner realized a gain of $12,600 on the transaction, all of which is taxable as ordinary income. We think it is clear from the evidence and we have found that although certificates No. 108 and No. 109, representing 12,000 shares and 6,400 shares, respectively, were *223 issued by the corporation in petitioner's name, they were immediately endorsed in blank by petitioner and turned over to Dandy and petitioner did not acquire any beneficial interest in those shares at that time. Although petitioner gave his check for $34,000 to the secretary of the corporation at that time, he received a cashier's check for $31,000 from Dandy within a few days thereafter, and the proceeds of this check, plus $3,000 in currency, were used to cover petitioner's check. The details of this transaction are not at all clear from the record, but we do believe that Dandy was purchasing the stock directly from the corporation at that time, and the stock was issued in petitioner's name to give the appearance that he had a sizable interest in the company. At least it is clear that petitioner realized no gain on the transaction at that time - everything he received from Dandy was paid over to the corporation and petitioner retained none of the stock. But the story does not end here. If Dandy was able to purchase 10,000 shares of the stock from the corporation for $1 per share, this must have been done through the use of petitioner's options. According to petitioner's testimony, *224 several months later, pursuant to a prior agreement, petitioner paid Dandy $8,000 and received in exchange stock certificates No. 105 and No. 107 representing 4,000 shares each and having a value of $2.50 per share. At this time petitioner realized a gain of $12,000, the difference between what he paid for the stock and its fair market value. As we see it petitioner was able to realize this gain only through an exercise or sale of his options. Petitioner apparently either exercised or assigned 8,000 options to Dandy to permit Dandy to buy the stock from the corporation at $1 per share with the understanding that Dandy would turn this stock over to petitioner when petitioner was able to pay him the $8,000 cost of the stock. We think the overall effect of this transaction was that petitioner, through the exercise of his options, ended up with 8,000 shares of stock having a value of $20,000 for which he paid $8,000, and that the difference is taxable to him as compensation and ordinary income. It makes no difference in this case whether this gain was realized in June or September - it is taxable to petitioners in 1961. We so hold. Decision will be entered under Rule 50. Footnotes
1. Respondent originally determined that petitioner realized unreported income in the amount of $2,612.15 evidenced by "unexplained" bank deposits. Petitioner concedes that $100 of this amount constituted additional income; respondent concedes that $962.15 does not constitute additional income. These concessions of respondent appear on brief and differ slightly from concessions enumerated on opening statment.↩
1. Respondent concedes that these deposits in the Bank of West Virginia were not income to petitioners. Respondent also concedes that $229.55 of the $249.55 deposited in the Ripley bank on Jan. 14, 1961, and that $150 of the $250 deposited in that bank on May 13, 1961, were not income to petitioners. Petitioners concede that the remaining $100 of the deposit in the Ripley bank on May 13 was unreported income to them in 1961. These concessions leave in dispute deposits totaling $1,550, all of which were in currency.↩
2. Petitioner initially claimed that the travel expenses were incurred in connection with business of Mountaineer.↩
3. It is not clear how many shares of stock were owned by petitioner, but it is clear that he controlled the corporation.↩
4. Petitioner testified that the original authorized capital of the corporation was $125,000.↩
5. The ultimate source of this $2,750 is not disclosed by the record, but petitioner seems to have considered that he was selling out to Trent and to Jefferson for $8,750. Presumably, $2,750 of the amount emanated from Jefferson.↩
6. It is not clear where or when petitioner acquired this stock, because the sale was subsequent to the date petitioner was supposed to have divested himself of all interest in the company.↩
7. The record is not clear on how this amount was computed. However, it would appear that it includes the gross selling price, totaling $9,750, from the three sales of options, and the profit, totaling $700, on the three sales of stock.↩
8. The source of this $3,000 cash is not explained in the record.↩
9. Petitioner concedes that he realized this gain. The record does not show when or from whom he received this stock.↩
10. This explanation is taken from a copy of the revenue agent's computation sent to petitioner at his request by the district director. Respondent objected to the admission of this document into evidence on the ground that respondent is not bound by the agent's computation. Respondent offered no evidence on how his determination was arrived at, and unless this document is referred to neither the Court nor the petitioner could have any idea how respondent arrived at the deficiency he determined.↩
11. The evidence on this issue consists primarily of petitioner's testimony and various checks and bank deposit slips which are not self-explanatory. We feel certain there must have been, or at least should have been, written corporate records available which would shed some light on these various transactions involving the issuance and transfer of corporate stock. While petitioner testified that he sold all of his interest in Mountaineer to Jefferson and Trent in January of 1961, he apparently was able to acquire some of the stock of Mountaineer at his $1 option price after he became active in the corporation again in June or July. While respondent offered no evidence to explain the basis for his determination, the burden was on petitioner to show that it was either arbitrary or wrong. Petitioner does not dispute the fact that the stock options were granted to him and that various stock certificates were issued in his name; his explanations of why find little support in any documentary evidence.↩
12. Sec. 1.421-6 Options to which section 421 does not apply. * * *
(d) Options without a readily ascertainable fair market value. If there is granted an option to which this section applies, and if the option does not have a readily ascertainable fair market value at the time it is granted, the employee in connection with whose employment the option is granted is considered to realize compensation includible in gross income under section 61 at the time and in the amount determined in accordance with the following rules of this paragraph: (1) Except as provided in subparagraph (2) of this paragraph, if the option is exercised by the person to whom it was granted, the employee realizes compensation at the time an unconditional right to receive the property subject to the option is acquired by such person, and the amount of such compensation is the difference between the amount payable for the property and the fair market value of the property at the time an unconditional right to receive the property is acquired. * * *
(3) If the option is not exercised by the person to whom it was granted, but is transferred in an arm's length transaction, the employee realizes compensation in the amount of the gain resulting from such transfer of the option, and such compensation is includible in his gross income in accordance with his method of accounting.↩